[Civ. No. 3278. Third Appellate District.—August 2, 1927.]

WILLIAM WESLEY FITZGERALD, Respondent, v.
GLOBE INDEMNITY COMPANY OF NEW YORK
(a Corporation), Appellant.

Hartley F. Peart, George F. McNoble and Charles V. Barfield for Appellant.

Levinsky & Jones for Respondent.

FINCH, P. J.—This is an action on an accident and health insurance policy issued by the defendant to the plaintiff October 11, 1916. Plaintiff was given judgment for the amount of unpaid indemnity at the weekly rate specified in the policy for total disability caused by disease. The defendant has appealed from the judgment on the judgment-roll and a bill of exceptions.

The complaint is in the usual form. It alleges that plaintiff has been totally and continuously unable to transact any business duties since the ninth day of February, 1918, the disability being caused by chronic nephritis, or Bright's disease; that the defendant has paid the indemnity provided to be paid by the policy for total disability up to January 19, 1922, but has refused to pay any indemnity thereafter. A copy of the policy is attached to and made a part of the complaint. It provides for payment of indemnity for total disability caused by disease at the rate of $50 a week, for a period not to exceed 52 weeks, "if such disease causes the insured to be totally and continuously unable to transact all duties pertaining to his occupation"; for intermediate disability at $25 a week if "unable to transact a major portion of all the duties pertaining to his occupation"; and for partial disability at $12.50 a week if "unable to transact a material portion of any or all duties pertaining to his occupation." There is indorsed upon the policy an "amendment rider," which contains the following: "In consideration of ten dollars additional premium, the undermentioned policy is hereby amended as follows: . . . If such disease causes the insured to be totally and continuously unable to transact all business duties, the company will pay for the entire period thereof, indemnity at the rate per week specified . . . for total disability." Plaintiff's occupation is stated in the schedule of warranties as follows: "My occupation and business duties, fully described, are as follows: Physician and surgeon, general practice, which I agree shall be classed as No. One." The policy contains a number

of provisions, among which is the following: "If any such injury is sustained by the insured while engaged in an occupation classed as more hazardous than that stated herein, recreation or ordinary duties about the residence excepted, liability hereunder shall be limited to such sum as the premium paid would have purchased for the increased hazard according to the company's table of rates or classification of risks last filed as above provided."

The issues presented on this appeal are clearly stated in appellant's opening brief as follows: "It is alleged in the answer that respondent was engaged in a dual occupation at the time of the execution of the policy, to-wit: his profession of physician and surgeon, and that of a walnut cultivator and grower, and that he has continued in such dual occupation ever since. . . . So far as actual occupations are concerned the policy is ambulatory and in fact contemplates changes therein by reason of the provisions limiting the company's liability in case the insured became engaged and was injured in any occupation more hazardous than that stated in the application. . . . But irrespective of the ambulatory provisions of the policy, the amendment rider eliminates the restriction upon business duties as pertaining to the occupation stated, and expressly prescribed 'all business duties.' There can be no doubt that maintaining walnut orchards and the sale of the produce therefrom is a business and would constitute an additional occupation of the insured." The court found that subsequent to the tenth day of October, 1916, and up to the ninth day of February, 1918, "plaintiff was engaged in the business of growing and cultivating walnuts for sale in the market." At the oral argument counsel for appellant said: "The company requested the doctor to submit himself to an examination of a board of physicians composed of Dr. Catton of San Francisco, Dr. Reid of San Francisco, Dr. Eugene Kilgore, Dr. Addis and Dr. Bine. Three of these doctors, as the record shows, Dr. Kilgore, Dr. Catton and Dr. Reid, found, and two so testified, that in their opinion, at least in 1922 when they made this examination, Dr. Fitzgerald was able to transact a portion of his duties as physician and surgeon and practice, as they described it, where free from the heavy strain of operative cases, and free from the in-

fection of the hit-and-miss run of patients. . . . The two other doctors felt it would be dangerous to engage in any practice. His partner, Dr. Dozier, Dr. Craviotto and Dr. Williamson all felt it was not proper for him to engage in any form of practice. Our position is that, there being a conflict in the record on the testimony of these physicians, we will not present . . . any argument upon that point at all. . . . But that has no relation to the demonstrated ability to perform these other duties." Appellant's argument is based upon the proposition, asserted in the briefs and at the oral argument, that the plaintiff was not "totally and continuously unable to transact all business duties" pertaining to his farming operations. But the evidence upon this question, also, is conflicting.

At the commencement of his illness the plaintiff was of the age of about fifty years. He had an established and lucrative practice as a physician and surgeon, about five times as much as the indemnity specified in the policy for total disability. He owned two farms, on each of which there were suitable farm buildings. One of these farms contained one hundred acres and the other sixty acres. He had planted both farms to walnuts, which were coming into bearing in commercial quantities about the time the policy was issued. Both farms were operated by men employed by the plaintiff and under his general supervision. He had become an expert in the care and cultivation of walnuts. In the early part of 1918 the plaintiff, acting upon the advice of his physicians, entirely abandoned his practice of medicine and surgery. He testified, and the court found, that at the same time he gave up the management and supervision of his walnut groves and farming operations.

Plaintiff's illness commenced with an attack of influenza in November, 1917. This was followed by an acute nephritis, or Bright's disease, which later developed into chronic nephritis. Plaintiff testified that he placed a man in "absolute and full charge" of his walnut groves and farming operations in 1918; that he "had a definite understanding" with this man that "he was to take complete charge and I was not to have any responsibility whatever; that I would give him a monthly allowance . . . and that he would render me a statement at the end of the month, . . . but I didn't want to be bothered about any details. . . . After

the commencement of 1919 . . . I left the management of the walnut groves . . . to their entire management. . . . At times I was sick abed. There would be times that I didn't get out of bed. There would be other times that there would be days and weeks that I would not get out of the house scarcely. There would be other times that I would be feeling pretty fair for three or four weeks. . . . I am emotional. I can't control myself and I have been that way all through my sickness. Little things worry me. Representatives of this company would come to me and try to explain why they didn't pay me. These visits upset me. I would spend six nights afterwards in sleepless nights. . . . After such occurrences I would be prostrated a week and probably confined to the bed or to the couch for several days. . . . I am not doing any business in relation to my walnut groves or any other business since I have been ill; the only business I have done is to notify my manager with the definite instructions that I was to have no responsibility or no cares about it. . . . Up to the time I rented the ranches I got a monthly statement from my man in charge as to their expenses and the like in connection with their operation. I found that annoyed me when they would bring their monthly statement in until I rented the Lodi place with an option of selling at a great sacrifice to relieve me even of the annoyance of having the manager come in with the monthly statement, and also sold half interest in the Cherokee Lane place with a written agreement that the man was to care for the place for a number of years. . . . Generally when these statements were in . . . as a rule I would be ill for three or four days. . . . For that reason I rented or sold the place. . . . I found that it was impossible for me to care for my health and have a monthly statement rendered to me. . . . Sometimes when I went to the place after I became ill I would see my manager there. . . . I generally asked them how things were going. I might ask them if it looked like it was going to be a good crop, . . . but I gave them no orders." Plaintiff's wife testified that he "has performed or done no . . . business of any kind, character or description since January, 1922"; that since that time "he spent most of the time on his couch or bed. . . . After January, 1922, we went for short rides in the country sometimes. We went to both of the ranches. One ranch is five miles out

. . . and the other is twelve miles. . . . Sometimes Dr. Fitzgerald got out of the machine at the ranches and sometimes he sat in the machine. When he got out of the machine he walked around a little bit, I should judge a half a block. He never walked further than a half a block as I recall. . . . When I went with him he drove the car.''

Dr. Addis, professor of medicine at Stanford University, who since 1911 has been "mainly engaged in the investigation of Bright's disease," and who, at the request of the defendant, examined the plaintiff in October, 1922, testified: "Dr. Fitzgerald was suffering from . . . chronic Bright's disease. . . . It is progressive. . . . A relief from mental and physical strain . . . is very important. . . . Dr. Fitzgerald was capable of taking a short walk, . . . of reading light literature, of going to a theater, but much more than that I thought he should not do. . . . I should consider the engaging in any business definitely bad for him. . . . I should be obliged to suppose that even under the best conditions Dr. Fitzgerald will gradually grow worse. . . . He had the mental attitude of strain and a hyper-excitability. . . . I thought any occupation which was not of a more or less automatic nature, and any occupation which would involve any cerebration on his part, would be prejudicial to him at that time. . . . I would not regard work which requires small mental effort for Dr. Fitzgerald as detrimental if it were not accompanied, as it usually is, of course, by responsibilities.'' Dr. Dozier, plaintiff's former partner and his attending physician during the entire period of his illness, testified that the plaintiff "would not have lived a period of two years had he attempted to practice medicine and surgery'' and that, at no time during his illness, has his condition been such as to warrant him in taking "active charge or supervision even of a walnut grove or any other sort of farm.'' Dr. Williamson testified that the plaintiff is not in condition to take the "responsibility of supervising or managing a ranch.'' Dr. Hill, clinical professor of medicine at Stanford University, and who examined the plaintiff in February, 1918, and at subsequent times, testified: "My examination extended over . . . three or four days. . . . Subsequently . . . I examined Dr. Fitzgerald many times, several times at least. . . . The last of these examinations . . . was on April 24th, 1923. . . . The disease had

progressed from December, 1919, . . . He then maintained a systolic pressure of 158, a diastolic of 105, and there was a trace of albumen, of many glandular casts, and a few hyaline casts. On April 24, 1923, . . . he had a systolic blood pressure of 185 and a diastolic blood pressure of 120. He had a heavy cloud of albumen, many large glandular casts and a few hyaline casts. This shows a definite progression from December, 1919, to April, 1923. . . . Physical exertion and nerve strain are most important to be avoided. . . . The condition is not such that he would not be physically able to carry them (professional duties) out. . . . It would have a marked tendency to increase the trouble which he had. . . . Increasing the trouble necessarily would have an effect of shortening his life. . . . I advised him the first time I saw him in February, 1918, to give up his work entirely, not to engage in any sort of work. . . . His condition at no time between 1918 and 1923 has improved to such an extent that my opinion in that regard has been altered. . . . He said he had a walnut ranch, as I remember, and he said he wanted to take care of this walnut ranch, and I said he couldn't do it.''

The plaintiff frequently drove his automobile on short trips and a few times on longer ones. He drove it down town nearly every day and made purchases of household supplies. He executed the contracts referred to in his testimony quoted herein and a few other contracts. For a time he received and examined monthly reports of the farming expenses. He maintained deposits in two banks and drew checks thereon from time to time. He paid taxes, insurance, and interest on money which he had borrowed. He performed other similar acts. Appellant centends that these acts constituted the transaction of ''business duties'' within the meaning of that term as used in the policy of insurance. While those acts are business transactions, they do not constitute engaging in business in the sense in which that term is ordinarily used. The mere fact that a professional man may make contracts in relation to his property, keep a bank account and pay his taxes, insurance, and other debts does not necessarily show that he is engaging in a business outside his profession. The doctor, the lawyer, the teacher, the preacher, and the priest do all these things without causing anyone to think that their occupations are dual.

■ But to concede that the plaintiff's acts amounted to the transaction of business duties within the meaning of the policy would not require a reversal of the judgment. The ultimate fact to be determined is not what the plaintiff actually did in the way of business duties but what, in the exercise of common care and prudence, he was reasonably able to do. Proof of what he did is merely evidence tending to show his ability to do, just as the opinions of the physicians who testified are evidence tending to show that his disability was or was not total. This expert opinion evidence alone, in view of the nature of the plaintiff's affliction, is sufficient to create a substantial conflict, and the finding of the trial court thereon is conclusive.

■ "The weight of authority supports the view that provisions in accident policies for indemnity in the event the insured is totally or wholly disabled do not require that the accident shall render the insured absolutely helpless, but such provisions are construed as meaning such a disability as renders him unable to perform the substantial and material acts of his business or occupation in the usual and customary way." (41 A. L. R. 1376; 37 A. L. R. 151; 24 A. L. R. 203; L. R. A. 1917B, 108; 23 L. R. A. (N. S.) 352; 38 L. R. A. 529; Joyce on Insurance, sec. 3031; May on Insurance, 4th ed., sec. 522; Bacon on Life and Accident Insurance, 4th ed., sec. 541.) An examination of the cases cited herein shows that the same rule applies in cases of disability caused by disease. ■ Appellant concedes "that perhaps the weight of outside authority is that in the ordinary case where provision is made for total disability alone, the courts will give practical construction to the language employed in order to make the policy *operative* and to prevent a *forfeiture,"* but that the same rule does not apply where the policy provides for "various degrees of disability." No logical reason appears, however, why the same rule should not be applied where the policy provides for both total and partial disability in order to make the total disability clause "operative and to prevent a forfeiture" of the indemnity provided by that clause. In either case a literal interpretation of the total disability clause would defeat the very purpose of insurance against total disability, because it rarely happens that an insured is so completely disabled that he can transact no business duty

whatever. The rule quoted has been applied in many cases where the policy in suit provided for both total and partial disability. (*United States Casualty Co.* v. *Perryman,* 203 Ala. 212 [82 South. 462]; *Fidelity & Casualty Co.* v. *Logan,* 191 Ky. 92 [229 S. W. 104]; *Bachman* v. *Travelers' Ins. Co.,* 78 N. H. 100 [97 Atl. 223]; *Fidelity & Casualty Co.* v. *Joiner* (Tex. Civ. App.), 178 S. W. 806; *Hefner* v. *Fidelity & Casualty Co.* (Tex. Civ. App.), 160 S. W. 330; *Commonwealth Bonding & Casualty Ins. Co.* v. *Bryant* (Tex. Civ. App.), 185 S. W. 979; *North American Accident Ins. Co.* v. *Miller* (Tex. Civ. App.), 193 S. W. 750; *Clarke* v. *Travelers' Ins. Co.,* 94 Vt. 383 [111 Atl. 449]; *Jacobs* v. *Loyal Protective Ins. Co.,* 97 Vt. 516 [124 Atl. 848].) In most of the other cases cited herein it does not appear whether or not the policies therein considered provided for both total and partial disability. The fact that the insured may do some work or transact some business duties during the time for which he claims indemnity for total disability or even the fact that he may be physically able to do so is not conclusive evidence that his disability is not total, if reasonable care and prudence require that he desist. (*United States Casualty Co.* v. *Perryman, supra; Great Eastern Casualty Co.* v. *Robins,* 111 Ark. 607 [164 S. W. 750]; *American Liability Co.* v. *Bowman,* 65 Ind. App. 109 [114 N. E. 992]; *Fidelity & Casualty Co.* v. *Logan, supra; Starling* v. *Supreme Council Royal Templars of Temperance,* 108 Mich. 440 [62 Am. St. Rep. 709, 66 N. W. 340]; *Lobdill* v. *Laboring Men's Mutual Aid Assn.,* 69 Minn. 14 [65 Am. St. Rep. 542, 38 L. R. A. 537, 71 N. E. 696]; *Rathbun* v. *Globe Indemnity Co.,* 107 Neb. 18 [24 A. L. R. 190, 184 N. W. 903]; *Bachman* v. *Travelers' Ins. Co., supra; Continental Casualty Co.* v. *Wynne,* 36 Okl. 325 [129 Pac. 16]; *Brown* v. *Missouri State Life Ins. Co.,* 136 S. C. 90 [134 S. E. 224]; *Hefner* v. *Fidelity & Casualty Co., supra; Fidelity & Casualty Co.* v. *Joiner, supra; Commonwealth Bonding & Casualty Ins. Co.* v. *Bryant, supra; North American Accident Ins. Co.* v. *Miller, supra; Metropolitan Casualty Ins. Co.* v. *Edwards* (Tex. Civ. App.), 210 S. W. 856; *Clarke* v. *Travelers' Ins. Co., supra; Jacobs* v. *Loyal Protective Ins. Co., supra; Starnes* v. *United States,* 13 Fed. (2d) 212; *Metropolitan Life Ins. Co.* v. *Bovello,* 56 App. D. C. 275, 12 Fed. (2d) 810.)

■ Both the evidence and the law support the conclusion of the trial court that the plaintiff was totally and continuously unable to transact the business duties of either occupation in which he was engaged at the commencement of his illness. His physicians advised him to desist therefrom and they testified at the trial that he was totally and continuously unable to transact his business duties without increasing bodily waste and hastening the progress of the disease which caused the disability. It cannot be said as a matter of law that the occasional transactions in which he engaged constituted the performance of "the substantial and material acts of his business or occupation in the usual and customary way" or conclusive proof that, in the exercise of reasonable care and prudence he was able to transact such business duties.

■ The court found that "prior to, and on said 10th day of October, 1916, said plaintiff was not engaged in the business of growing or cultivating walnuts for sale in the market." Appellant contends that this finding is not supported by the evidence. The finding is not material to any issue in the case. The court found that the plaintiff was engaged in such business prior to and at the commencement of his illness and, on the defendant's theory of the case, proof that he was thereafter able to transact the business duties pertaining to that business would have been a complete defense. The answer does not allege that the plaintiff misrepresented his occupation in his application for insurance and counsel for defendant stated at the trial that it did "not claim any fraud on the part of the doctor."

■ On cross-examination of plaintiff's wife by counsel for defendant, she was asked the following questions: "On an average how many times would you and the doctor go out to the ranches a week after January, 1919, that is after this year was past? Would the doctor on the occasions when he began to go back to the ranch with you after this year following his illness talk with the men in charge of these ranches?" Counsel for the plaintiff objected "upon the ground that it is not within the scope of the direct examination, we have not gone into the period between 1918 and January, 1922." The court sustained the objection. As a basis for such cross-examination, appellant makes two quotations from the direct examination of the

witness as follows: "To my knowledge after February, 1918, the doctor never engaged or did anything in the practice of his profession of medicine. People called him in a professional way after 1918. I generally received the phone call or messages. I did not let them talk with him or see him. I told them he was ill. The doctor spent his time lying down, at home. I was with him all of the time. Q. And when he spent the time at home what did he do, did he read? A. Yes, sir." "As far as I can observe there has been changes in Dr. Fitzgerald's mental condition since February, 1918. He is nervous and irritable. He was not nervous or irritable before February, 1918." Counsel for defendant did not direct the attention of the trial court to the testimony to which it is now contended the cross-examination related. While it may be said that the questions were within the range of liberal cross-examination it does not appear that the defendant was substantially prejudiced by the ruling. Defendant was permitted to examine the plaintiff as a witness in relation to all his activities during the entire period of his illness. As stated, what plaintiff actually did during that period was important only as tending to show what he was capable of doing. His physical condition, the progress and effect of his disease, and the activities in which he was capable of engaging with prudence, all called for the testimony and opinions of medical experts who had examined him. Against such testimony and opinions it is not probable that the trial court would have acted upon its own conclusions based upon what the plaintiff actually did. In view of the foregoing considerations, it cannot be held that the ruling "complained of has resulted in a miscarriage of justice." The court sustained objections to a series of questions asked the plaintiff regarding the development of his walnut groves, the income therefrom, his work in connection therewith, and his lectures on walnut growing and marketing, all relating to times prior to the issuance of the policy of insurance. While evidence of the character indicated by the questions would have tended to show that plaintiff's farming operations constituted a business, any error in the ruling was harmless, because the court found that the plaintiff was engaged in such business prior to and at the commencement of his illness and, as

stated, it is immaterial whether he was engaged in such business prior to the issuance of the policy. ▇ The court sustained objections to other questions by which the plaintiff was asked what he received from his former partner, Dr. Dozier, on the dissolution of the partnership, when he received the last check in that connection, whether he was still receiving checks from Dr. Dozier, and whether he deposited the checks so received in a bank. Answers to such questions might have had some slight tendency to show business capacity, but the matter is not of sufficient importance to require a reversal of the judgment.

While the weight of the evidence is for the determination of the trial court, an examination of the whole record strongly leads to the conclusion that the judgment is just.

The judgment is affirmed.

Glenn, J., *pro tem.*, and Plummer, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 29, 1927.