[Civ. No. 2055. Fourth Appellate District.—June 21, 1938.]

DAVID S. WRIGHT, Respondent, v. THE PRUDENTIAL INSURANCE COMPANY OF AMERICA (a Corporation), Appellant.

Hickcox & Provence for Appellant.

Stearns, Luce, Forward & Swing, Fred Kunzel, Meserve, Mumper, Hughes & Robertson and Shirley Meserve as *Amici Curiae,* on Behalf of Appellant.

John G. Cope and Hunter R. Skinner for Respondent.

HAINES, J., *pro tem.*—On December 1, 1925, the Imperial Valley Milk Producers Association, a corporation doing business in Imperial Valley, to which we shall hereinafter refer as the "Milk Producers Association", obtained from appellant, The Prudential Insurance Company of America, hereinafter referred to as "appellant insurer", for the benefit of its employees, or such of them as should agree to participate therein, a policy of group insurance numbered G–1904, which was issued upon what is known as the one-year renewable term plan. To the original application for the policy made by the Milk Producers Association there was attached a schedule of the employees to be initially insured thereunder, and the application, which became part of the contract, contained the following language:

"Each of said employees is to be *insured* in accordance with the following

## "PLAN OF INSURANCE

### SCALE OF BENEFITS

"(1) On effective date of contract, insured employees to have at least $500 insurance.

"(2) Insured employees whose term of service is one year, but less than two years, $1,000 insurance.

"(3) Insured employees whose term of service is two years, but less than three years, $1,500 insurance.

"(4) Insured employees whose term of service is three years or more, $2,000 insurance.

"(5) In future, no employee shall be eligible for insurance until one month in service of Association.

"(6) On anniversary date of insurance contract, each employee insured for less than $2,000 insurance to be increased according to above scale."

Under the head of "General Provisions" the master policy issued to the Milk Producers Association contained this clause:

"ADDITIONS TO THE NUMBER OF INSURED.—New Employees of the Employer eligible for insurance in the group or class insured under this policy may from time to time, subject to evidence of insurability satisfactory to the Company, be added to the group or class originally insured hereunder, and, subject to the terms of the Policy, insured in accordance with the plan of insurance set forth in the application for this Policy, provided that no evidence of insurability will be required of employees added within sixty days from the date of eligibility according to the Plan of Insurance. The employer shall notify the Company whenever such new employees are to be added, and, if premiums be payable otherwise than monthly, premium adjustments effective from the date when such additions are made shall be made as provided in the clause headed 'Payment of Premiums'. The Employer's payrolls and other similar records shall be open for inspection by the Company for the purpose of determining the amounts of insurance under this Policy and the premiums therefor."

The premiums were to be paid quarterly in advance by the Milk Producers Association to appellant, the insurer, the

first payment to be made coincidentally with the issuance of the policy, in amounts fixed with reference to the ages of the respective employees, it being stipulated that the Milk Producers Association and the employees should contribute jointly toward the amounts required to make the payments; that the contribution of the Milk Producers Association should not be less than 25 per cent of the total premium and the contribution of an individual employee not more than 60 cents per month for each thousand dollars of insurance. In the payment of any premium under the policy, except the first, a grace of 31 days, without interest, was to be allowed, during which the policy was to remain in force. It was provided with respect to renewals, that:

"This policy is issued upon the one-year renewable term plan and may be renewed on each succeeding anniversary of its date for successive terms of one year each, upon the payment on or before the date of each renewal of the premium for the amount of insurance to be renewed."

On December 20, 1926, by mutual agreement between the Milk Producers Association and the insurer the policy was so amended as to provide that December 21, 1926, and subsequent anniversaries thereto were to be considered the anniversaries of the date of the policy for the purpose of renewals. The contemplated insurance was upon the lives of the respective employees, payable at death to such beneficiary as they should respectively designate, but a provision for total and permanent disability benefits for assured employees was also included. Respondent, Wright, who had previously been in the employ of the Milk Producers Association, reentered its employ early in 1931, and signed an "authorization of payroll deduction" wherein and whereby he authorized the Milk Producers Association to deduct 30 cents a month from his wages to apply toward the premium for group insurance; and on April 15, 1931, pursuant to the terms of its said policy G–1904 appellant insurer issued to respondent an individual certificate numbered 95 insuring respondent in the amount of $500. This certificate in which respondent is designated as "the employee" contains, among other provisions, the following:

"If the said employee, while less than sixty years of age, and while the insurance on the life of said employee under said Policy is in full force and effect shall become totally

and permanently disabled or physically or mentally incapacitated to such an extent that he or she by reason of such disability or incapacity is rendered wholly, continuously and permanently unable to perform any work for any kind of compensation of financial value during the remainder of his or her lifetime, said amount of insurance will be paid to said employee either in one sum six months after the Company has received due proof of such disability or incapacity, or in monthly instalments during five years, the first instalment to be payable immediately upon receipt by the Company of due proof of such disability or incapacity; in accordance with the provisions of said Policy. The disability benefits will be granted subject to cessation, in accordance with the provisions of the Policy, should such disability or incapacity prove to be temporary and not permanent. The entire and irrecoverable loss of the sight of both eyes, or of the use of both hands, or of both feet, or of one hand and one foot, will be considered total and permanent disability or incapacity within the meaning of the provisions of said Policy.''

Respondent's insurance was without further action on his part from time to time increased in amount. Respondent claims and the court found that under the terms of the group policy its amount became $2,000 as of April 15, 1934, that being three years after respondent actually acceded to the group insurance plan. Appellant insurer claims that the increase to $2,000 did not become effective until December 1, 1934, as we take it, for the reason that a rider acknowledging such increase was issued bearing that date. Why that date should have been selected and inserted in the rider we do not know. At all times with which we are concerned there were deducted monthly by the Milk Producers Association from his wages and included by it in premiums which it paid quarterly to appellant insurer, 60 cents per month for each thousand dollars of insurance carried by him, except that the first deduction in the amount of $1.20 which would correspond to a coverage of $2,000 was made on January 5, 1935, that is from respondent's December wages.

However, on December 21, 1934, the annual anniversary date of the said group policy G–1904, the Milk Producers Association, for reasons of economy, instead of renewing this policy, took out a substitute policy numbered G–4780, which omitted all provision for disability benefits and thencefor-

ward paid to appellant insurer correspondingly reduced premiums. No change was, in consequence of this substitution, made in the amounts deducted from the wages of employees as their contribution toward the payment of premiums. When this substitution was effected or attempted, appellant insurer issued to the Milk Producers Association individual certificates for its employees, including one numbered 41 for respondent, but the assistant secretary of the Milk Producers Association neglected either to deliver this certificate to respondent, or acquaint him with the change in the policy carried and he seems to have known nothing about it until February 16, 1936, when the condition of his health compelled him to leave the employ of the Milk Producers Association, whereupon, upon demanding his disability benefits he was, for the first time, informed of the substitution and was tendered the said certificate 41, which he at first refused to accept, though on February 25, 1936, that is after he had left the employ of the Milk Producers Association, he did accept it. This certificate 41 contains the language:

"This certificate supersedes all former certificates issued to the employees named herein in connection with Group Life policy G–1904 which is no longer in force."

Respondent did not, however, accept this certificate 41 until he had received a letter from appellant insurer dated February 24, 1936, saying *inter alia*:

"You realize, of course, that policy G–1904 has been cancelled, but if the evidence shows that your disability dates back to the time when the policy was in full force, and also if the evidence shows that you are totally and permanently disabled, consideration will be given the claim."

Respondent's education stopped with the seventh grade. His occupation was that of assistant engineer in the boiler room of the Milk Producers Association. He was employed on night shifts, sometimes in the evening and sometimes in the early morning. His duties incidentally required him from time to time to handle and stack hundred-pound sacks of dried milk. Respondent testified that he had no disability in 1931, when he became a participant in the group insurance, that his physical condition was then perfect and continued to be such into the spring of 1934; that he first began to notice a change in his condition in September, 1934. "The

change was that I would get up out of bed at twelve thirty at night to go to work. I would crawl around through the room while I got my clothes on and got to work. Then I would feel better and go on and do my shift." He says that his hands and legs were then all right but the difficulty he felt was in his hips and that he "figured it was kidney trouble". Also his right eye was beginning to get dim. Previously he had had good eyesight. By September he could see, but not with his right eye. He had had no accident to it. In October, 1934, he went to a Dr. Webster, who took a test and when he got through said: "It is a nervous trouble and I can't do anything for you." Respondent says that "In October my feet got numb and then it raised out of my feet to my hands and then it kept getting worse all the time." He got tired and his feet wouldn't track. He couldn't control them. They were slow. If he got in the dark he was lost. His left eye continued good until about the first of the year (1935) and then it started getting weak, but his right eye was getting worse all the time. In October, 1934, the numbness was starting in his right hand and that was when he went to Dr. Webster. In November, 1934, he first was somewhat better and then became worse. In November he couldn't, with his right eye, see the steam gauge on the boiler. He had to do as little work as he could. He couldn't really do a man's work but "got by". He got worse in December, 1934, particularly in his hands. He could hardly write with his right hand. He tried to drive some screws but could not. He laid off for a week. He continued thereafter to work as best he could. He piled his milk bags low "and let the other boys pile theirs up higher". In December, 1934, his right eye was practically gone and his left eye weakening. In 1935 he went on with his work. He "wasn't doing it right but got by with it" without being discharged.

In February, 1936, he was "messing around with it", not performing it right, but "getting by with it", until he finally made up his mind to quit. His right eye has been completely gone since January, 1936.

Dr. O. L. Webster, a duly qualified physician and surgeon, testified that he made a thorough examination of respondent on October 4, 1934; that respondent had a loss of sensation in the tips of his fingers; that his biceps were diminished and that he was suffering from a disseminated sclerosis, that is

a degeneration or wasting away of the spinal cord. Webster again examined him on October 25, 1935, at which time "his symptoms were worse and his condition exaggerated. He had considerable weakness and his reflexes were more diminished. At the present time medical science offers no cure for the disease. It is permanent. It is doubtful if he will regain the use of his hands." Webster says that in October, 1934, he told respondent that it was dangerous for him to continue to work. Disseminated sclerosis is a progressive disease, but there are remissions at times. Its exact cause is unknown and the exact time of its inception, also unknown, so far as the possibility of its being objectively determined is concerned.

L. A. Bowman, a chiropractor, cared for respondent from January 1, 1935, for a time. He found a curvature of the spine and partial paralysis, lack of coordination in the use of the hands, trouble in walking, partial paralysis in the diaphragm. On January 7, 1935, an X-ray was taken. Bowman thought at first that the trouble was a partial paralysis, but he now thinks it must be a nervous or other condition at the spinal cord. Bowman advised respondent to quit work.

H. A. Blume, another chiropractor, testified to treating respondent beginning with September, 1935, and concluded that he had "rotary scoliosis of the spine or neurosis of the nerves and the spinal cord". On September 1, 1935, respondent was "blind in one eye", had extreme weakness, couldn't walk except by holding on to something, his spine had . . . very bad lateral curvature; he felt weak in the legs below the hips. Blume last examined him on November 27, 1935, when his condition was not essentially changed. In his opinion the disability is permanent. He thinks the cause is "nerve pressure".

One Lott, the general manager of the Milk Producers Association, testified that when respondent came to work with that concern in 1931 he was in good condition; that by the fall of 1934, however, respondent had at times difficulty in maintaining the use of his arms and limbs and complained of numbness in his lower limbs particularly; that he had a recurrence of these spells from time to time, including one in the fall of 1935 and "up to the time he left us in '36"; that he, Lott, at a time which he is unable to fix, had a talk with

respondent relative to changing his work; that respondent at that time informed Lott of his condition and described his feelings and the report of his physician; whereupon Lott advised him to take off time whenever he should, that is, not to attempt to work when it was not safe, and expressed a willingness to have other men in the plant do part of respondent's work and thereby to help him make his job as light as possible. After this, Lott says that he confined respondent's work mainly to watching the machinery, firing the boiler and so forth, leaving it optional with respondent to what extent he participated in handling the milk and piling up the sacks of dried milk.

One Savage, assistant secretary of the Milk Producers Association, testified that he had been with that organization since November, 1927, and knew respondent; that in February of 1931 respondent had appeared to be in good physical condition; that, however, in the fall of 1934 respondent was "sick and off duty"; that during part of the time that respondent was working he was able to get around; that at times respondent would not have good control over his hands; that as Savage understood the matter respondent did not have feeling in his fingers at times.

There is some discrepancy between the testimony above recited and respondent's pleadings with respect to the time when his disability began. It is in this connection alleged in paragraph IX of the first cause of action in his complaint that:

"That on or about the 16th day of January, 1934, said plaintiff was compelled to cease work intermittently because of sickness and disease and remain absent from his employment to the 31st day of January, 1934, and for the same illness and disease was later incapacitated from employment from the 16th to the 28th day of February, 1934, and from the 1st day of March to the 15th day of March, 1934, and from the 14th day of October, 1935, to the 24th day of November, 1935, and on the 16th day of February, 1936, has been totally and presumably permanently disabled and physically incapacitated to such an extent that he, by reason of such disability and incapacity, is rendered wholly, continuously and permanently unable to perform any work for any kind of compensation of financial value."

This is followed in paragraph X by the allegation:

"That on and prior to the 1st day of September, 1934, the plaintiff herein became and was permanently, as well as totally disabled so as to presumably for life be prevented from engaging in any occupation or employment for wage or profit. That on and prior to said date he had suffered the loss of use of both hands, and numbness and slowness of the use of his feet, as well as defective vision and lack of muscular coordination. . . ."

Both of these paragraphs are by adoption embodied also in respondent's second cause of action and both are denied *in toto* in the answer. The court's findings on the subject are those numbered VII and VIII, which are respectively as follows:

"VII. That plaintiff, due to physical disability, was, during the times alleged in paragraph IX, of his complaint, and during other times, compelled to cease work; that during the month of October, 1934, plaintiff's physical condition was such that at that time he was advised by competent medical advisers that his condition would at all times thereafter be one of total disability and incapacity; that said condition was permanent, and from that date he would be for the rest of his life wholly, continuously and permanently unable to perform any work for any kind of compensation of financial value; that plaintiff's employer, the Imperial Valley Milk Producers Association, continued his name on its pay roll to and including the 16th day of February, 1936, when, at plaintiff's request, his name was removed therefrom.

"VIII. That during the month of October, 1934, plaintiff suffered the loss of the use of both hands and numbness and slowness of the use of his feet, blindness of one eye and defective vision of the other eye, and lack of muscular coordination; that the said loss of the use of said members of his body, as well as the lack of muscular coordination existed prior to his attaining the age of sixty years, while he was the employee of the Imperial Valley Milk Producers Association. The above mentioned total and permanent disabilities occurred while said insurance contract with defendant herein sued upon was in full force and effect; that plaintiff at all times complied with all the conditions upon his part to be performed as required of him under the terms of his contract with the said insurer."

■ The ultimate question, then, that we are called upon to decide is, as correctly stated in appellant's brief:

"Is the evidence sufficient to support the finding that the plaintiff became totally and permanently disabled while the policy of group insurance under which he sues was in full force and effect?"

There is no dispute that the policy sued upon (G–1904) was, in some amount at least, in force as to respondent at all times between April 15, 1931, and December 21, 1934, and if, therefore, at any time within that period, he became totally and permanently disabled, he is entitled to recover the amount of insurance in force in his favor when such total and permanent disability occurred.

In the light of the medical and other evidence recited and in support of the trial court's findings, we must, as we think, take it to be true that, as early as the fall of 1934, respondent's ailment had reached a stage when, in the exercise of ordinary care for his own health, he ought to have ceased work, not temporarily only, but permanently and entirely. This he did not in fact do, but instead, continued, as best he could, to follow his occupation until February 16, 1936, and to receive compensation for such services as he in the meantime rendered. Does that circumstance make it impossible to consider his permanent and total disability as dating from the fall of 1934? The answer to this question depends on which of two lines of conflicting authorities shall be held to be the law in this state. On the one hand are cases adhering to the strict letter of the policy, such as *Equitable Life Assurance Society of the United States* v. *Singletary,* (Fourth Circuit) 71 Fed. (2d) 409; *Boozer* v. *Equitable Life Assurance Society of the United States,* 206 N. C. 848 [175 S. E. 175]; *Boyd* v. *Equitable Life Assurance Society of the United States,* 274 Mich. 1. [263 N. W. 780]; *Stewart* v. *Pioneer Pyramid Life Ins. Co.,* 177 S. C. 132 [180 S. E. 889]; *Bean* v. *Travelers' Ins. Co.,* 164 Okl. 135 [23 Pac. (2d) 216]; *Pegues* v. *Equitable Life Assurance Society of the United States,* (Mo. App.) 57 S. W. (2d) 705; relied on by counsel for appellant.

In *Equitable Life Assurance Society of the United States* v. *Singletary, supra,* the plaintiff was in the employ of the Southern Railway up to June 15, 1931, and while so engaged was covered by insurance against total and permanent disability. There was evidence that he had had periodic attacks

of dysentery for several years prior to 1931 whereby he was usually disabled for from one week to a month. In the fall of 1931 he had had a particularly severe attack and by June, 1932, an abscess of the liver had developed, accompanied by partial paralysis. To some extent he recovered .from this, but not sufficiently to permit him to do any work. There was no evidence that the plaintiff suffered from a disabling attack of dysentery in June, 1931. He had worked up to June 8th and made repeated attempts in the following week to retain his job. There was no medical testimony to show that he was seriously afflicted with dysentery or prevented from working during the summer of 1931. The court said that:

"In this state of the evidence, we cannot agree that it might reasonably be concluded that plaintiff's condition was such, on or prior to June 15, 1931, as to wholly and presumably permanently prevent him, for life, from pursuing any and all gainful occupations."

In *Boozer* v. *Equitable Life Assurance Society of the United States, supra,* the evidence at the trial was that while the plaintiff was insured under a policy against total and permanent disability, existent during his employment, he contracted a disease which, by its very nature, affected his mind. It was progressive and incurable. Notwithstanding his having contracted the disease he continued to perform his work as an employee of the concern for which he had been working and earned and was paid full wages until he was finally discharged for a breach of one of its rules. Some months thereafter he was adjudged insane as a result of the disease referred to and became both totally and permanently disabled thereby, and unable to engage in any occupation of financial value. The court held that inasmuch as he was able to perform and did perform the duties of his employment up to and including the day of his discharge, which terminated his insurance, he could not in the meantime be held to have suffered total and permanent disability such as to entitle him to the benefits of the policy.

In *Boyd* v. *Equitable Life Assurance Society of the United States, supra,* the plaintiff was an employee of a rubber company. Its employees participated in group insurance wherein they were insured against such disabilities as should wholly and presumably permanently prevent them from following any gainful occupation. The insurance by its terms auto-

matically ceased with the termination of the employment. The plaintiff was overcome by aniline dye fumes while at his work and was in the hospital for a week, after which he returned to work, but later gave it up. Some time after doing so he was found to be disabled by pulmonary tuberculosis, which the trial court apparently attributed to the injury from the dye fumes. The judgment in his favor was reversed, the court saying *inter alia*:

"It is not sufficient under the terms of the policy here involved to establish that during the time plaintiff's certificate was in force he became afflicted with a disease which subsequent to the lapse of his certificate resulted in his being totally and permanently disabled. . . . Under the record before us it must be held plaintiff has failed to prove that his total and presumably permanent disability developed during the period his insurance was in force."

No reference was made in the opinion in this case to the earlier Michigan case of *Starling* v. *Supreme Council Royal Templars of Temperance, infra.*

In *Stewart* v. *Pioneer Pyramid Life Insurance Co., supra,* it was held that in an action on the disability clause of a life insurance policy where the condition to recovery was the occurrence of total and permanent disability, an insured who regularly and continuously was engaged in customary employment in the usual manner save for pain and slowness of movement occasioned by arthritis during the period in which the disability was claimed and received compensation for his work during that time, was not totally and permanently disabled within the meaning of the policy.

In *Bean* v. *Travelers' Ins. Co., supra,* it was held that where an employee was disabled from injuries sustained during employment developed after the termination thereof recovery could not be had under a group policy covering the employee. The court said:

"The plaintiff contends that if an employee covered by group insurance is injured while an employee and terminates his employment and total permanent disability develops after the termination of the employment, recovery may be had under the individual certificate issued as a part of the group life policy. That contention is without merit."

In *Pegues* v. *Equitable Life Assurance Society of the United States, supra,* there was involved a policy of life insurance

issued to employees of the National Lead Company under the group plan which provided that "the insurance of any employee shall automatically cease and determine on termination of employment . . . " The insured became ill while so employed and because of such illness left the employment of the National Lead Company and something over a year thereafter died of said illness. It was held that in the circumstances the beneficiary under the policy could not maintain an action upon it. The condition to the right of recovery was that the decedent be at the time of his death an employee, and he had ceased to be.

As contrasted with the line of cases just referred to, there is another line of cases in which a different and much more liberal construction of policies indemnifying against "total" and "permanent" or "total and presumably permanent" disabilities is adopted. Thus in *Starling* v. *Supreme Council Royal Templars of Temperance*, 108 Mich. 440 [66 N. W. 340, 62 Am. St. Rep. 709], a case where under the terms of a policy the right to recover depended upon a showing of disability for life such as to prevent the plaintiff from following his own or any other avocation, a verdict in the plaintiff's favor was upheld, notwithstanding an instruction in which the trial court had said that:

"The fact that a man may work for a few moments, even though, perhaps, he may work for a few months, will not, necessarily,—it is not conclusive evidence that he can follow some avocation."

In *Prudential Insurance Co. of America* v. *South*, 179 Ga. 653 [177 S. E. 499, 98 A. L. R. 781], where a railway switchman, under the group plan, carried insurance against total disability, which, according to the policy would accrue whenever the insured was "rendered wholly, continuously and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value during the remainder of his life", and he met with an accident necessitating the amputation of one arm just below the shoulder, a judgment of nonsuit was reversed. There was evidence that the railway had no use for a one-armed man in the capacity in which the insured had been engaged; that he had earned nothing since his injury and was unable to perform any substantial work of a physical nature and that his education was too meager to render him eligible for any other

work. The court said that the words "occupation" and "work" must each be construed according to the facts and circumstances of the execution of the contract, including the objects to be effectuated thereby, and went on to say that:

" 'Total disability', irrespective of the technical variations in the language employed, should be given a rational and practical construction. The phrase is a relative term, depending upon the circumstances and peculiar facts of each particular case, and is usually a question of fact to be determined by the court or jury trying the case."

The policy in that case had provided that:

"Without prejudice to any other cause of disability, the company will recognize the entire and irrecoverable loss of the sight of both eyes, or of the use of both hands, or of both feet, or of one hand and one foot, as total and permanent disability under this policy."

It was stated that the expressions "any occupation" and "any work": "should be construed to mean the ordinary employment of the particular person insured, or such other employment, if any, approximating the same livelihood, as the insured might fairly be expected to follow, in view of his station, circumstances, and physical and mental capabilities. . . . If the insured is so incapacitated that substantially all of the material activities of any such employment are reasonably closed to him, he is totally disabled within the meaning of the policy." (Citing *Wall* v. *Continental Casualty Co.*, 111 Mo. App. 504 [86 S.W. 491.] ; *Industrial Mut. Indemnity Co.* v. *Hawkins*, 94 Ark. 417 [127 S. W. 457, 29 L. R. A. (N. S.) 635, 21 Ann. Cas. 1029] ; *Hutchinson* v. *Supreme Tent*, 68 Hun, 355 [22 N. Y. Supp. 801] ; *Keith* v. *Chicago B. & Q. R. Co.*, 82 Neb. 12 [116 N. W. 957, 23 L. R. A. (N. S.) 352, 130 Am. St. Rep. 655] ; *Metropolitan Life Ins. Co.* v. *Bovello*, 12 Fed. (2d) 810 [56 App. D. C. 275, 51 A. L. R. 1040] ; *Cody* v. *John Hancock Mut. Life Ins. Co.*, 111 W. Va. 518 [163 S. E. 4, 86 A. L. R. 354].)

In *Bullard* v. *Prudential Ins. Co. of America*, 53 Ga. App. 721 [187 S. E. 133], the court said:

"As appears from the record and the briefs of counsel, the only issue raised in the trial was whether the plaintiff's disability was total and permanent within the meaning of the contract of insurance. The group policy and the plaintiff's certificate declared the total disability payable if the

insured employee should become totally and permanently disabled, either physically or mentally, to such an extent that he (or she) was rendered wholly, continuously, and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value during the remainder of his (or her) lifetime, etc.

"The evidence showed that the plaintiff, for three years prior to the time of his injury, was engaged in the occupation of a weaver in a cotton mill; that this work required incessant walking and standing; that after being injured he could no longer do the work and the bleachery company refused to reemploy him because of his physical incapacity; that he quit school when he was thirteen years old, having completed the sixth grade, and had no other education; that he was nineteen years old when injured; that of various employments which he had tried since losing his leg, none had afforded him any approximation of what he had earned before that, and all had been of short duration, etc.

"As was held in *Prudential Insurance Co.* v. *South,* 179 Ga. 653 [177 S. E. 499, 98 A. L. R. 781], the test is the insured's inability 'to pursue his ordinary work or any work of like productivity'. Whether this condition existed, notwithstanding the insured may have worked or have been able to work after the accident, is in this case a question for the jury.

"The evidence therefore presented an issue of fact as respects the totality of the disability, and authorized a verdict for the plaintiff."

In *Temples* v. *Prudential Ins. Co. of America,* 18 Tenn. App. 506 [79 S. W. (2d) 608], one Temples, an uneducated man, was employed by a railway as boilermarker's helper and insured under a group policy against total and permanent disability. While in the course of his work he sustained a rupture but continued on his job until for other reasons discharged and afterward worked in a restaurant, operated a filling station, and acted as a night watchman. In sustaining a judgment based upon the verdict of a jury in his favor the court held the question of liability one upon which a jury might legitimately pass and said that total disability and permanent disability are issues of fact to be determined on the evidence adduced in each individual case, and went on as follows:

"The phrase 'total disability' has a well-understood meaning in the law of insurance. It does not mean a state of absolute helplessness. The decisions, almost without conflict, define that condition as an inability to do the material acts necessary to the prosecution of insured's business or occupation (and substantially all the material acts) in (substantially) his usual or customary manner. Cases so holding are too numerous to be set out. They are cited and quoted in 14 R. C. L. 1315, 1 C. J. 462, and notes, 51 A. L. R. 1048, 41 A. L. R. 1376, 37 A.L.R. 151, 24 A. L. R. 203.

"One may still be described as totally disabled, although he is able at intervals to perform certain acts in connection with the former occupation or calling that he pursued. (*Pacific Mutual Life Ins. Co.* v. *McCrary*, 161 Tenn. 389, 392 [32 S. W. (2d) 1052, 1053].) . . .

"The fact that the insured may do some work or transact some business duties during the time for which he claims indemnity for total disability or even the fact that he may be physically able to do so is not conclusive evidence that his disability is not total, if reasonable care and prudence required that he desist. (*Fitzgerald* v. *Globe Indemnity Co.*, 84 Cal. App. 689 [258 Pac. 458, 462]; *New York Life Insurance Co.* v. *McLean*, 218 Ala. 401 [118 So. 753]; *Harrison* v. *Provident Life & Accident Insurance Co.*, 167 Tenn. 394 [70 S. W. (2d) 24].)"

In *Pacific Mutual Life Insurance Co. of California* v. *Ringold*, 47 Fed. (2d) 738, Ringold held a policy insuring him against permanent total disability in which it was provided that:

"Permanent total disability as used herein shall be construed to mean that there is neither then nor will be at any time hereafter any work, occupation, or profession that the insured can ever sufficiently do or follow to earn or obtain wages, compensation or profit."

Without stating the facts in detail it was laid down that:

"It is enough to say that the evidence persuasively showed the health of the insured to have been so bad that he was largely unable to work at all and was never in condition to work, except at the expense of impairment of his health, and with the result of attendant pain and suffering that he could not have been expected to endure, and at the serious risk of the shortening of his life."

It was *inter alia* said that:

"The test . . . depends upon permanent total disability, defined to mean inability to ever sufficiently do or follow, to earn or obtain wages, compensation, or profit, any work, occupation, or profession; and not upon an actual so engaging by an .insured, while he was permanently and totally disabled."

In *New York Life Ins. Co.* v. *McLean,* 218 Ala. 401 [118 So. 753], it was said:

"If the insured's physical condition, as a result of the disease, is such that common care and prudence required that' he desist from transacting business, and his condition is presumably permanent and continuous, he is permanently and totally disabled, within the meaning of the contract, though he may not be physically disabled to perform occasional acts connected with his business, profession or occupation."

In *Equitable Life Assurance Society of the United States* v. *Watts,* 230 Ala. 297 [160 So. 713], the benefit sued for was under the terms of the policy payable:

"In the event that any employee while insured under the aforesaid policy and before attaining age 60 becomes totally and permanently disabled by bodily injury or disease and will thereby presumably be continuously prevented for life from engaging in any occupation or performing any work for compensation of financial value, upon receipt of due proof of such disability before the expiration of one year from the date of its commencement."

The court said:

"The mere fact that, when not suffering an acute attack of asthma, he could and did, up to the time of trial, perform some such work, would not justify an affirmative instruction for the defendant. If work is accompanied by suffering, aggravation of a chronic disease, in such sort that sound medical advice says not to work, the fact that there is still strength to do it at times, and, under stress of circumstances he does so perform, will not defeat his right to the total permanent disability benefit under stipulations here presented. (*New York Life Ins. Co.* v. *Torrance,* 228 Ala. 286 [153 So. 463]; Id., 224 Ala. 614 [141 So. 547]; *Equitable Life Assurance Soc.* v. *Dorriety,* 229 Ala. 352 [157 So. 59].; *Metropolitan Life Ins. Co.* v. *Blue,* 222 Ala. 665 [133 So. 707, 79 A. L. R. 852]; *United States Casualty Co.* v. *Perryman,* 203 Ala. 212 [82

So. 462]; *Travelers' Ins. Co.* v. *Plaster,* 210 Ala. 607 [98 So. 909]; *New York Life Ins. Co.* v. *McLean,* 218 Ala. 401 [118 So. 753].)"

As between the opposed authorities then, of which the foregoing are but examples, by no means exhausting the list on either side, on the one hand demanding practical helplessness as the test of total disability, and on the other tending to make the test whether or not in the exercise of reasonable care one can pursue a gainful occupation with a fair degree of continuity, it remains to inquire what the decisions in this state have to say. *Fitzgerald* v. *Globe Indemnity Co. of New York,* 84 Cal. App. 689 [258 Pac. 458], was a case where a physician and surgeon, also incidentally engaged in the business of walnut growing, which he superintended in a general way, had a health and accident policy insuring him in different amounts against various degrees of disability in his occupation and also against "total and continuous disability to transact all business duties". He contracted Bright's disease which made it dangerous for him to do anything requiring any great degree of physical exercise or mental application. He abstained from trying to practice medicine and surgery and left most of the conduct of his walnut growing to subordinates but did from time to time visit his ranches, receive reports and go over statements, though this activity worried him. He drove his automobile, did banking, paid his taxes and insurance premiums and handled some other routine matters. In sustaining a judgment in his favor the court (pp. 697, 698) said:

"But to concede that the plaintiff's acts amounted to the transaction of business duties within the meaning of the policy would not require a reversal of the judgment. The ultimate fact to be determined is not what the plaintiff actually did in the way of business duties but what, in the exercise of common care and prudence, he was reasonably able to do. Proof of what he did is merely evidence tending to show his ability to do, just as the opinions of the physicians who testified are evidence tending to show that his disability was or was not total. This expert opinion evidence alone, in view of the nature of the plaintiff's affliction, is sufficient to create a substantial conflict, and the finding of the trial court thereon is conclusive.

" 'The weight of authority supports the view that provisions in accident policies for indemnity in the event the in-

sured is totally or wholly disabled do not require that the accident shall render the insured absolutely helpless, but such provisions are construed as meaning such a disability as renders him unable to perform the substantial and material acts of his business or occupation in the usual and customary way.' (41 A. L. R. 1376; 37 A. L. R. 151; 24 A. L. R. 203; L. R. A. 1917B, 108; 23 L. R. A. (N. S.) 352; 38 L. R. A. 529; Joyce on Insurance, sec. 3131; May on Insurance, 4th ed., sec. 522; Bacon on Life and Accident Insurance, 4th ed., sec. 541.) An examination of the cases cited herein shows that the same rule applies in cases of disability caused by disease.

''Appellant concedes 'that perhaps the weight of outside authority is that in the ordinary case where provision is made for total disability alone, the courts will give practical construction to the language employed in order to make the policy *operative* and to prevent a *forfeiture'*, but that the same rule does not apply where the policy provides for 'various degrees of disability''. No logical reason appears, however, why the same rule should not be applied where the policy provides for both total and partial disability in order to make the total disability clause 'operative and to prevent a forfeiture' of the indemnity provided by that clause. In either case a literal interpretation of the total disability clause would defeat the very purpose of insurance against total disability, because it rarely happens that an insured is so completely disabled that he can transact no business duty whatever. The rule quoted has been applied in many cases where the policy in suit provided for both total and partial disability. (*United States Casualty Co.* v. *Perryman*, 203 Ala. 212 [82 So. 462]; *Fidelity & Casualty Co.* v. *Logan*, 191 Ky. 92 [229 S. W. 104]; *Bachman* v. *Travelers' Ins. Co.*, 78 N. H. 100 [97 Atl. 223]; *Fidelity & Casualty Co.* v. *Joiner*, (Tex. Civ. App.) 178 S. W. 806; *Hefner* v. *Fidelity & Casualty Co.*, (Tex. Civ. App.) 160 S. W. 330; *Commonwealth Bonding & Casualty Ins. Co.* v. *Bryant*, (Tex. Civ. App.) 185 S. W. 979; *North American Accident Ins. Co.* v. *Miller*, (Tex. Civ. App.) 193 S. W. 750; *Clarke* v. *Travelers' Ins. Co.*, 94 Vt. 383 [111 Atl. 449]; *Jacobs* v. *Loyal Protective Ins. Co.*, 97 Vt. 516 [124 Atl. 848].) In most of the other cases cited herein it does not appear whether or not the policies therein considered provided for both total and partial disability. The fact that the insured may do some work or transact some business duties

during the time for which he claims indemnity for total disability or even the fact that he may be physically able to do so is not conclusive evidence that his disability is not total, if reasonable care and prudence require that he desist (*United States Casualty Co.* v. *Perryman, supra*; *Great Eastern Casualty Co.* v. *Robins*, 111 Ark. 607 [164 S. W. 750]; *American Liability Co.* v. *Bowman*, 65 Ind. App. 109 [114 N. E. 992]; *Fidelity & Casualty Co.* v. *Logan, supra*; *Starling* v. *Supreme Council Royal Templars of Temperance*, 108 Mich. 440 [62 Am. St. Rep. 709, 66 N. W. 340]; *Lobdill* v. *Laboring Men's Mutual Aid Assn.*, 69 Minn. 14 [65 Am. St. Rep. 542, 38 L. R. A. 537, 71 N. E. 696]; *Rathbun* v. *Globe Indemnity Co.*, 107 Neb. 18 [184 N. W. 903, 24 A. L. R. 191]; *Bachman* v. *Travelers' Ins. Co., supra*; *Continental Casualty Co.* v. *Wynne*, 36 Okl. 325 [129 Pac. 16]; *Brown* v. *Missouri State Life Ins. Co.*, 136 S. C. 90 [134 S. E. 224]; *Hefner* v. *Fidelity & Casualty Co., supra*; *Fidelity & Casualty Co.* v. *Joiner, supra*; *Commonwealth Bonding & Casualty Ins. Co.* v. *Bryant, supra*; *North American Accident Ins. Co.* v. *Miller, supra*; *Metropolitan Casualty Ins. Co.* v. *Edwards*, (Tex. Civ. App.) 210 S. W. 856; *Clarke* v. *Travelers' Ins. Co., supra*; *Jacobs* v. *Loyal Protective Ins. Co., supra*; *Starnes* v. *United States*, 13 Fed. (2d) 212; *Metropolitan Life Ins. Co.* v. *Bovello*, 12 Fed. (2d) 810 [56 App. D. C. 275, 51 A. L. R. 1040].)''

*Sherman* v. *Continental Casualty Co.*, 103 Cal. App. 518 [284 Pac. 946], was a case of insurance against loss of time resulting from accident or sickness. A total, though not a permanent disability, was claimed and the stipulated benefit in such a situation was sued for. The plaintiff was an automobile saleswoman and after the accident involved which occurred on July 20, 1926, she engaged in some intermittent activity during the next few months which constituted the period for which disability was claimed. The court said, (p. 521):

''While there appears to be some conflict in the authorities as to what shall constitute total disability within the meaning of a clause of insurance such as we have here, there is ample authority to be found both in the decisions and the text books to the effect that in order to constitute total disability it is not necessary that the insured be absolutely helpless, and that an attempt by the insured to perform a few occasional trivial acts relating to the duties of his employment, though in fact he ought not to have made such attempt,

does not deprive him of the right to show that he was totally disabled (Cooley's Briefs on Insurance, 2d ed., pp. 5538, 5539, citing *United States Casualty Co.* v. *Perryman*, 203 Ala. 212 [82 So. 462]), it being held sufficient if the injuries are of a character and degree that common care and prudence require him to desist from his labors so long as it is reasonably necessary to effect a speedy cure.    (Kerr on Insurance, p. 385; 4 Joyce on Insurance, p. 303; *Continental Casualty Co.* v. *Mathis*, 150 Ky. 477 [150 S. W. 507]; *Harasymczuk* v. *Massachusetts Acc. Co.*, 127 Misc. 344 [216 N. Y. Supp. 97]; *Pacific Mutual Life Ins. Co.* v. *Branham*, 34 Ind. App. 243 [70 N. E. 174]; *Booth* v. *United States Fidelity & Guaranty Co.*, 3 N. J. Misc. 735 [130 Atl. 131]; *American Liability Co.* v. *Bowman*, 65 Ind. App. 109 [114 N. E. 992]; *Jones* v. *Fidelity & Casualty Co.*, 166 Minn. 100 [207 N. W. 179, 182].) In the case last cited in dealing with the question of total disability it was said:

" 'Should the insured be penalized because, in total ignorance of the serious character of the injury he had received, he undertook to perform, as best he could, under distressing conditions, some of his professional duties, when he might reasonably not have attempted to do any work at all, and thus, without question, have held the insurer liable for loss from disability?' "

Other California cases have said in substance that the question of what amounted to total disability was one of fact. (*Bochner* v. *Equitable Life Assurance Society of the United States*, 4 Cal. App. (2d) 670 [41 Pac. (2d) 365]; *Ives* v. *Prudential Insurance Co.*, 12 Cal. App. (2d) 306 [55 Pac. (2d) 273].)

While the facts in the instant case exhibit differences in detail from those involved in *Fitzgerald* v. *Globe Indemnity Co. of New York, supra,* and *Sherman* v. *Continental Casualty Co., supra,* nevertheless it seems to us that the result here must largely be controlled by the doctrine laid down in those cases; that the test of disability is not what the insured actually did in the effort to perform his duties, but what, in the exercise of due prudence he was reasonably able to do.    This was a question of fact on which the trial court's determination, in so far as founded on any substantial evidence, is binding upon us.    There is some degree of overstatement in the above-quoted finding VIII as respects the loss of use of respondent's hands.    As appears from his testi-

mony quoted in an earlier part of the opinion he does claim that the numbness which he felt "raised" in October, 1934, "out of my feet to my hands"; that it kept getting worse all the time. Elsewhere he states that in that month it was "starting in my right hand". We cannot say, however, that the total picture as given us in said findings VII and VIII of his ailment as of October, 1934, even with this qualification, is insufficient under the rule announced in *Fitzgerald* v. *Globe Indemnity Co. of New York, supra,* and *Sherman* v. *Continental Casualty Company, supra,* to amount to total and permanent disability.

While the "entire and irrecoverable loss of the sight of both eyes, or of the use of both hands, or of both feet, or of one hand and one foot", are situations, which, if shown, must, under the terms of the group insurance, be recognized by appellant insurer as total and permanent disabilities, it is not essential that any of these specified situations occur in order that there be such disability. It is only necessary that *some* ailment or combination of ailments result in such disability in order to compel recognition that the disability exists.

In fine, we think the evidence sufficient to sustain the trial court in holding that respondent was, within the meaning of the policy, totally and permanently disabled as early as October, 1934. This renders it unnecessary to go into the somewhat difficult questions argued in the briefs concerning the validity of the substitution of policy G–4780 for the policy G–1904. The circumstance that respondent did, as above stated, finally accept, on February 25, 1936, his individual certificate 41 under policy G–4780 is not, in our opinion, of any importance. As we have hereinbefore observed, when he received that he had already been in receipt of appellant's letter of February 24, 1936, saying in effect that if he had any valid claim under policy G–1904 it would be recognized, and in the circumstances his receipt of the new certificate must be deemed to have been subject to that understanding. At the time this new certificate 41 was received he had already left the employ of the Milk Producers Association and the new certificate had no other value in his hands than to give him the privilege, within 31 days after the termination of his employment, upon payment of the premium therefor, at the current rates, without evidence of insurability, to take out an ordinary policy of life insurance, which it is not claimed that he ever did, and which privilege would also have existed

under the old policy. His receipt of the new certificate could not by any possibility in any way have misled appellant insurer to its detriment, nor have estopped him to assert any right vested in him under policy G–1904.

There remains one other phase of the case to be disposed of. The trial court found the principal amount of the insurance payable to the respondent to be $2,000. This is necessarily predicated on the theory that the final $500 was automatically added to the amount theretofore carried as of a date not later than April 15, 1934, which would be three years after the original certificate 95 under policy G–1904 was issued to respondent. We have seen that such increase was not recognized by appellant insurer until December 1, 1934, and that the increase in deductions from respondent's wages for his contribution to the increased premium by reason of the increase in the amount of the policy was first made from his wages for the month of December, 1934, which would be after the time (October, 1934) as of which we have sustained the trial court in finding that the respondent's total and permanent disability occurred.

We are unable to agree with the view taken by the trial court on this phase of the case. While, under the provisions of the policy quoted by us in the early part of this opinion, employees of three years or more of service are entitled to an increase in the amount of their insurance up to $2,000, yet by a further provision there quoted such increase only takes effect ''on anniversary date of insurance contract''. The anniversary date of the master policy was December 21st. This date had been fixed upon long before respondent became a party to the arrangement. In behalf of respondent it is urged that, so far as he was concerned, the contract consisted of three elements: (a) the application made by the Milk Producers Association; (b) the master policy G–1904, redated as of December 21, 1926; and (c) respondent's accession thereto evidenced by his written consent as of April 15, 1931, that deductions for contributions toward premium payments should be made from his wages, and that, therefore, it should be deemed as to him to have sprung into existence as of April 15, 1931; and that April 15th should therefore, as to him, be treated as its anniversary date, and accordingly, that as of April 15, 1934, being the first anniversary date after he had completed three years of service, the increase in its amount by the final $500 automatically occurred. We

are in agreement with the contention that the increase when it did occur was automatic. We find no other requirement in the policy that any certificate of such increase be issued than may be deemed to result from the following language carried therein under the general head: "Provisions as to Employee's Certificate and Conversion of Individual Insurance", to wit:

"The company will issue to the employer for delivery to each person insured under this policy an individual certificate setting forth the insurance protection to which such person is entitled hereunder and to whom such insurance is payable. . . . "

We do not believe that any neglect of appellant insurer to issue a certificate of increase on the date, whatever that may be, when the increase was due, could operate to delay its effectiveness. We cannot agree, however, that the anniversary date of what counsel for respondent refer to as the "entire contract", as it affected respondent, was April 15th. It is competent in entering into a contract for the parties, if they so desire, to agree that it shall be dated as of a previous time. That is not precisely what was done here, but respondent did, as of April 15, 1931, agree to participate in the benefits of a policy that already distinctly specified that its anniversary date should be December 21st. In our opinion he thereby assented to the use for that purpose of that date. It follows that the anniversary date of the policy next following the expiration of respondent's three years of service was not April 15, 1934, but December 21, 1934, and that the increase in his insurance to $2,000 could not have become automatically effective until that date. The circumstance that appellant issued a certificate recognizing the increase as having occurred on December 1, 1934, could not, at the most, estop it to deny that the increase occurred at a date earlier than that. It appears inevitably to follow that the respondent was not protected by the final $500 of insurance in October, 1934, when he is found to have been totally and permanently disabled.

The judgment is therefore modified by reducing the amount awarded by way of principal of the insurance from $2,000 to $1500, the same to bear interest as originally provided, from February 16, 1936. As so modified the judgment is affirmed, the parties respectively to pay their own costs on appeal.

Barnard, P. J., and Marks, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 18, 1938.