[Civ. No. 26829. Fourth Dist., Div. One. Jan. 11, 1985.]

EDWARD L. FIELDS, Plaintiff and Appellant, v.
BLUE SHIELD OF CALIFORNIA, Defendant and Respondent.

COUNSEL

Shernoff & Levine and Harvey R. Levine for Plaintiff and Appellant.

Hassard, Bonnington, Rogers & Huber, William B. Sturgeon and B. Thomas French for Defendant and Respondent.

OPINION

STANIFORTH, Acting P. J.—Physician-psychiatrist Edward L. Fields' (Dr. Fields) action seeks compensatory damages from group insurer Blue Shield of California (Blue Shield) by reason of Blue Shield's refusal to pay for medical treatment (psychoanalysis) received by Dr. Fields in 1978. Dr. Fields also seeks punitive damages for breach of the insurer's duty of good faith and fair dealing.

During the course of the jury trial Dr. Fields moved for a directed verdict for reimbursement of the compensatory damages, arguing that as a matter

of law the exclusion in the 1976 plan was inoperative as to him. Dr. Fields asserted he did not receive notice of the modification as required by California law. The trial court refused to rule on the motion for directed verdict but rather submitted the question to the jury as an issue of fact. The jury by general verdict found for Blue Shield. Dr. Fields appeals, contending the exclusion relied upon by Blue Shield is invalid as a matter of law and as he is entitled to the benefits under the terms of the 1975 health plan unmodified. He also seeks a new trial on the issue relating to the breach of the insurer's implied covenant of good faith and fair dealing.

## FACTS

Commencing July 1974 both Dr. and Mrs. Fields worked at the Veterans Administration Hospital, San Diego. Mrs. Fields was a federal employee eligible for an Aetna Insurance Company (Aetna) group policy. She obtained health insurance coverage under the Federal Employees' Health Benefits Act (5 U.S.C.A. §§ 8901-8913) for herself as the employee and Dr. Fields as the dependent.

In October 1974 Dr. Fields began receiving a prescribed psychiatric treatment—psychoanalysis—from Dr. Douglas Orr who diagnosed Dr. Fields as suffering from a mental illness classified "obsessive compulsive anxiety neurosis."

A year before, Dr. Fields, a medical doctor, determined he wanted to become a psychoanalyst. To attain such a career goal, he was required to complete 300 hours of personal psychoanalysis. This prescribed period was a training requirement requisite to becoming a psychoanalyst. Dr. Fields enrolled in San Diego Psychoanalytic Institute in September 1973 and decided to enter into psychoanalysis with Dr. Orr.[1] This was commenced in October 1974. Dr. Fields did not begin his course work in the San Diego Analytic Institute until September 1975. He did however receive credit on the institute's training analysis requirement from the time his analysis began in 1974.

By the end of 1974 both Dr. and Mrs. Fields were employed at the Veterans Administration Hospital and were eligible for hospital and medical insurance under the Blue Cross and Blue Shield Federal Employee Program. In late December 1974, the Fields, after review of the Blue Shield group policy, switched coverage from Aetna and enrolled in the Blue Shield Service Benefit Plan for 1975. Their declared reasons were: The Blue Shield

[1] Dr. Orr was/is a psychiatrist and founder of the San Diego Psychoanalytic Institute, La Jolla, California.

group policy covered 100 percent of certain hospital charges whereas Aetna covered only 80 percent. Secondly, the Aetna plan for 1975 reduced benefits available for psychoanalysis; Blue Shield did not. Premiums were deducted from Dr. Fields' paycheck for the Blue Shield policy commencing in 1975. Dr. Fields continued receiving treatment from Dr. Orr. After some delay Blue Shield paid Dr. Fields the full amount owing under the policy for the year 1975 and continued payments for Dr. Orr's services until April 1978 when it refused to pay for further psychoanalysis.

In 1976 Blue Shield expressly inquired of Dr. Orr whether the treatment with Dr. Orr was "credited towards earning a degree [or] furtherence [*sic*] of education." Dr. Orr's response to this question was "[*T*]*he training requirement* [*300 hours*] *was met during the first week of January 1976.*" (Italics added.) This statement of the attending physician (Orr) was received by Blue Shield in June 1976 and Dr. Fields' claim was reviewed at least three times thereafter in that year. Blue Shield also reviewed the claim in 1977 and continued payment for the psychoanalysis treatment until 1978. Blue Shield again reviewed Dr. Fields' claim, then disallowed benefits for psychoanalysis in reliance upon the 1975 policy language as "clarified in the 1976 plan."

### The Policy(s)

In June 1975 when Dr. Fields enrolled in the Blue Shield group health insurance plan (policy), the policy specifically provided under SUPPLEMENTAL BENEFITS (p. 16) for psychotherapy "not exceeding a total of 2 hours per day"[2] with a "*lifetime maximum*" benefit payable "*for treatment of nervous and mental illness*" of $50,000. (Italics added.)[3]

There is no clear, plain or express exclusion found in the 1975 policy for psychiatric care or psychoanalysis if the treatment received was also used

---

[2]The policy provides: "*Nervous and mental illness*—In addition to other services and supplies covered by Basic or Supplemental Benefits, the following services are covered under Supplemental Benefits:

"Day-night hospital services

"Individual or group therapy not exceeding a total of 2 hours per day, and collateral visits with members of the patient's immediate family, provided by a therapist who is a physician, clinical psychologist, psychiatric nurse, or psychiatric social worker."

[3]"*The lifetime maximum Supplemental Benefits payable for each subscriber are*:

| HIGH OPTION | LOW OPTION |
|---|---|
| $250,000 | $150,000 |

"*Exceptions for nervous and mental illness*—Under both options, *the lifetime maximum Supplemental Benefits payable for treatment of nervous and mental illness is $50,000 for each subscriber.* Expenses applied to this $50,000 maximum benefit also apply to the $250,000 high option or $150,000 low option lifetime maximum benefit." (Italics added.)

in furtherance of education or training of the subscriber. However, in the 1976 policy (p. 20) under the heading "SUPPLEMENTAL BENEFITS" this exclusion appeared: "Services not covered—. . . Psychoanalysis or psychotherapy, provided to a Subscriber or any family member, that is credited towards earning a degree or furtherance of the education or training of a Subscriber, regardless of diagnosis or symptoms that may be present."

A brochure was provided to the Fields each year to inform them of policy benefits. It advised them benefits may be modified or terminated. The following language appeared on page 2 of the 1975 plan brochure: "The contract may be modified or terminated. However, no such modification or termination will affect adversely any benefit for a covered service rendered prior to such modification or termination." Identical language appeared on page 2 of the 1976, 1977 and 1978 plan brochure. In the 1976 and 1977 plan booklets the following additional language appeared at the bottom of page 2: "To the extent that benefits for a service or supply are eliminated or modified for a new contract year, benefits will not be provided for those services or supplies rendered after the effective date of the elimination or modification, even though benefits may have been provided for the same service or supply rendered before the effective date of the elimination or modification."

In late 1975 Dr. Fields obtained the 1976 brochure,[4] "Service Benefit Plan 1976." On page 31 of the 32-page 1976 benefit plan Blue Shield notified its insurers in bold type: "HOW PLAN CHANGES IN JANUARY 1976." Blue Shield warned the brochure had been reorganized and should be read in its entirety. The booklet then stated: "In addition to many clarifications, *the following benefit changes are effective January 1, 1976.*" (Italics added.) Blue Shield then listed on this page 13 coverage changes effective January 1, 1976. Of the 13 specific changes listed, only 2 limited or lowered benefits. Furthermore, there is no significant benefit reduction found elsewhere in the entire 1976 brochure except on page 20 where the exclusion in issue was placed.

Significantly, page 31 notified the insureds of *increased* coverage for psychiatric care by reference to coverage for hypnosis and hypnotherapy which had not been covered under the 1975 benefit plan. However, none of the changes set forth at page 31 notified the insureds that psychoanalysis provided to the insured, regardless of symptoms or diagnosis, would be excluded from coverage if the insured concurrently received credit for psychoanalysis as part of an educational program.

---

[4]Dr. Fields testified the brochure was *not* sent to him. He went to the personnel office and asked for one.

Of legal significance also is the fact that pages 20-24 of the 1976 brochure, under the bold-type heading EXCLUSIONS, set forth 34 coverage exclusions from the insurance plan. There is no hint that psychoanalysis or psychotherapy received in conjunction with education or training of an insured is not covered.

However, at page 20 of the 1976 brochure under the bold-type heading "SUPPLEMENTAL BENEFITS" and under the bold-type subheading "COVERED SERVICES AND SUPPLIES," *Blue Shield placed at the end of a series of granted coverage in unremarkable type the following exclusion* (called "Services not covered"): *"Psychoanalysis or psychotherapy provided to a Subscriber or any family member, that is credited towards earning a degree or furtherance of the education or training of a Subscriber, regardless of diagnosis or symptoms that may be present."* (Italics added.)

Dr. Fields testified he read the benefit booklet when first received in 1975. He read the 1976 booklet page entitled "HOW PLAN CHANGES" in January 1976. (P. 31.) Dr. Fields testified he had no actual notice of the reduction in benefits in the 1976 plan because he only read the page marked "changes," which advised him that although "clarifications" occurred throughout the plan, the entire plan should be read. Following were the specific changes represented to have been made. The deletion of benefits for psychoanalysis whether or not conjoined with furtherance of education or training of the subscriber—a significant reduction in benefits—was not listed among those specific changes or reductions of coverage. Dr. Fields further testified continued payments were made by Blue Shield from June 1976 through March 1978, after its having received Dr. Orr's response.

DISCUSSION

I

It is a general rule a party is bound by contract provisions and cannot complain of unfamiliarity of the language of a contract. (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 [131 Cal.Rptr. 882, 552 P.2d 1178].) Thus an insured has a duty to read his policy. (*Aetna Casualty & Surety Co. v. Richmond* (1977) 76 Cal.App.3d 645, 652 [143 Cal.Rptr. 75]; *Taff v. Atlas Assur. Co.* (1943) 58 Cal.App.2d 696, 703 [137 Cal.Rptr. 483].) This duty to read is insufficient to bind a party to unusual or unfair language unless it is brought to the attention of the party and explained. (*Weaver v. American Oil Company* (1971) 257 Ind. 458 [276 N.E.2d 144, 148, 49 A.L.R.3d 306]; see also Calamari, *Duty to Read—A Changing Concept* (1974) 45 Fordham L.Rev. 341, 351, 358.)

■ Dr. Fields concedes a general duty to read but argues Blue Shield may not enforce the reduction of service in 1976 because as a modification, and an exclusion, it was not conspicuous, plain and clear as required by California law. ■ It is a long-standing general principle applicable to insurance policies that an insurance company is bound by a greater coverage in an earlier policy when a renewal policy is issued but the insured is not notified of the specific reduction in coverage. (*Industrial Indem. Co. v. Ind. Acc. Com.* (1949) 34 Cal.2d 500, 506 [211 P.2d 857]; *Sorensen v. Farmers Ins. Exch.* (1976) 56 Cal.App.3d 328, 333 [128 Cal.Rptr. 400].) As this court said in *Zito v. Firemen's Ins. Co.* (1973) 36 Cal.App.3d 277, 282 [111 Cal.Rptr. 392]: "*[A]n insurer when renewing a policy may not change the terms of the policy, without first notifying the insured . . . .*" (Italics added.)

The California Supreme Court stated in *Steven v. Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 879 [27 Cal.Rptr. 172, 377 P.2d 284]: "In standardized contracts, . . . the California courts have long been disinclined to effectuate clauses of limitation of liability which are unclear, unexpected, inconspicuous or unconscionable." *Steven* declares in the case of "standardized" (insurance) contracts, made between parties of unequal bargaining strength, exceptions and limitations on coverage the insured could reasonably expect must be called to the subscriber's attention clearly and plainly· before· the exclusion will be interpreted to relieve the insurer of the liability for performance. (*Logan v. John Hancock Mut. Life Ins. Co.* (1974) 41 Cal.App.3d 988, 996 [116 Cal.Rptr. 528]; see *Sorensen v. Farmers Ins. Exch., supra,* 56 Cal.App.3d 328, 333; *Miller v. Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 752 [161 Cal.Rptr. 322]; *Ponder v. Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 718 [193 Cal.Rptr. 632].) ■ The uncontested evidence before the trial court demonstrates this limitation of coverage was placed, not in the limitation or exclusion section, but at the end of benefit granting provisions. Blue Shield did not notify Dr. Fields by a clear, conspicuous notice in an expected place that coverage he originally had was now totally withdrawn. The rules of law, these facts, required the granting of Dr. Fields' motion for directed verdict as to the specified compensatory damages.

## II

■ ■ ■ ■ ■ Blue Shield, however, contends the above-cited rule requiring an exclusion from coverage in a policy "'. . . must be conspicuous, plain and clear'" (*Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 271 [54 Cal.Rptr. 104, 419 P.2d 168]) has no application to group policy here, citing *Madden v. Kaiser Foundation Hospitals, supra,* 17 Cal.3d 699, 710, for the proposition its policy is not an "adhesion" con-

tract,[5] therefore not governed by the "conspicuous, plain and clear" rule of notice as to exclusions.

In *Madden* the Board of Administration of the State Employees Retirement System (Board) negotiated a medical services contract with Kaiser Foundation Health Plan on behalf of state employees. The contract contained a provision requiring arbitration of all malpractice claims. Madden, a state employee, enrolled in the plan, claimed the arbitration provisions could not be given effect, arguing that the medical services contract was an adhesion contract. Because she was unaware of the arbitration provision she should not be bound by it.

The California Supreme Court found the Kaiser plan was not an adhesion contract and therefore Madden's lack of knowledge of arbitration clause did not invalidate it. The court held the plan was not an adhesion contract because three factors present in an adhesion contract were not present in the Kaiser plan. First, in all adhesion contract cases the provisions at issue were weighted in favor of the stronger party. In contrast, the Supreme Court reasoned the arbitration provision did not burden Madden more than Kaiser. It was "beneficial" to both according to the Supreme Court. Second, in an adhesion contract generally the stronger party drafts the contract and the weaker party has no opportunity to negotiate its terms. In *Madden, the Board had negotiated on behalf of the state employees* and had parity of bargaining strength with Kaiser. Third, a characteristic of adhesion contracts is that the weaker party must either accept the contract or forego the needed services. The Supreme Court found Madden enjoyed the opportunity, either to select among several medical plans negotiated by the Board, some of which did not include arbitration provisions, or to contract individually for medical care. (*Madden* v. *Kaiser Foundation Hospitals, supra,* 17 Cal.3d 699, 711.)

Scholars have viewed the *Madden* decision, in large measure, to be based upon the strong preference for arbitration as an alternative dispute resolution technique. (Note, *Contracts—An Agent's Authority to Bind a Principal to Arbitration* (1977) 65 Cal.L.Rev. 355, 364 (*Contracts—Arbitration*).)

---

[5]California law defines an adhesion contract as a standardized contract written entirely by a party with superior bargaining power, leaving the weaker party in a take it or leave it position. (*Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, 269; *Ponder* v. *Blue Cross of Southern California, supra,* 145 Cal.App.3d 709, 719.) Counsel has stipulated Dr. Fields' Blue Shield plan was not an adhesion contract. This stipulation however does not remove the conspicuous, plain and clear requirements from the contract's enforcement. *A stipulation to a legal conclusion* even when made by able and competent trial counsel is not binding on the court—though it may be binding on the parties. (*San Francisco Lumber Co.* v. *Bibb* (1903) 139 Cal. 325, 326 [73 P. 864]; *Burdette* v. *Rollefson Construction Co.* (1959) 52 Cal.2d 720, 724-725 [344 P.2d 307].)

California Courts of Appeal and federal court decisions after *Madden* have uniformly restricted the *Madden* rule to its limited factual setting. (*Beynon v. Garden Grove Medical Group* (1980) 100 Cal.App.3d 698, 704 [161 Cal.Rptr. 146]; *McLaughlin* v. *Connecticut General Life Ins. Co.* (N.D. Cal. 1983) 565 F.Supp. 434, 448.)

The recent case of *Beynon* v. *Garden Grove Medical Group, supra,* 100 Cal.App.3d 698, held if a clause in a group health policy limits the company's obligations or liabilities, this alone is sufficient to distinguish *Madden.* (*Id.,* at p. 708.) In *Beynon* the contract required arbitration of malpractice claims and granted insurer the unilateral right to reject the arbitrator's decision and demand rearbitration. The court found this provision was entirely in the defendant's favor. On this ground alone the adhesion contract construction principles would apply. (*Id.,* at pp. 705-706.)

In *Wheeler* v. *St. Joseph Hospital* (1976) 63 Cal.App.3d 345 [133 Cal.Rptr. 775, 84 A.L.R.3d 343], the appeal court found an arbitration clause in a hospital admission form invalid and adhesory because the patient was not specifically informed of the clause before signing the form and because the clause was ambiguous. In its analysis, the court relied principally on *Tunkl* [*Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 (32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693)] rather than *Madden.* It read the *Madden* decision as grounded upon agency principles, not controlling on the adhesion issue. (*Wheeler, supra,* at p. 364.)

The conclusion Blue Shield would draw from *Madden* rests upon these further shifting sands: *Madden* is bottomed upon a statutory proviso making the Board agent of the insureds in negotiating the insurance contract. This fact does not apply in the federal statutes here involved. The employees at the Veterans Administration Hospital were not represented by the Office of Personnel Management as were the California employees on the California Board. The federal Office of Personnel Management is created by the employer, the United States government (5 U.S.C.A. § 8901 et seq.), who is paying only part of the premium on behalf of the employees. (Cf. *Beynon v. Garden Grove Medical Group, supra,* 100 Cal.App.3d 698.) Thus, the employer may have a totally separate and distinct interest, perhaps adverse to the employee in the matter of bargaining with any insurance company for a group policy for its employees. Absent a statute such as found in *Madden,* agency is generally a question of fact. (*Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 658-659 [186 Cal.Rptr. 578, 652 P.2d 426]; see also *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 820 [171 Cal.Rptr. 604, 623 P.2d 165]; *Contracts—Arbitration, supra,* 65 Cal.L.Rev. at p. 364, and fn. 48.) Here, as in *Beynon* v. *Garden Grove*

*Medical Group, supra,* at page 706, there is no evidence the employer negotiated as an agent on behalf of the employee subscribers.

■ California has long ago determined *the employer in administering the group insurance policy is not the agent of the employee. (Elfstrom* v. *New York Life Ins. Co.* (1967) 67 Cal.2d 503, 512 [63 Cal.Rptr. 35, 432 P.2d 731]; *Metropolitan Life Ins. Co.* v. *State Bd. of Equalization, supra,* 32 Cal.3d 649, 659.) To reach a different result to find an agency on behalf of Dr. Fields in the negotiation of this reduction of benefit in the 1976 policy without his consent and without notice to him of the exclusion in a plain, clear and conspicuous fashion by the process of implication of agency strikes at the very heart of the long-standing public policy regarding rules of construction of insurance policies where forms are standardized and designed for mass distribution. If the *Madden* rule of construction is applied beyond the triad of conditions there found, the effect upon millions of group policyholders in California would be disastrous.

If the *Madden* rule is not limited to the three articulated preconditions, then the salutary public policy long demanding the rules of construction applicable to insurance policies as adhesive contracts will be undermined. (*Contracts—Arbitration, supra,* 65 Cal.L.Rev., at p. 364.) This result would be contrary to long-established public policy principles in this state aimed at protection of the general public against highly refined legalistic policy carefully designed for the benefit of the insurer.[6]

■ If it be assumed, arguendo, the Blue Shield policy is not an adhesion contract, the plain, clear conspicuous rule still applies. In *Jones* v. *Crown Life Ins. Co.* (1978) 86 Cal.App.3d 630 [150 Cal.Rptr. 375, 6 A.L.R.4th 826], the appeal court held the rule construing ambiguities in a policy against the insurer applied to group life and health insurance contracts regardless of whether the contracts were deemed adhesive. The court said: "Defendant [insurer] contends that if the principles regarding the interpretation of adhesion contracts are not applied, plaintiff could not recover as a matter of law. Defendant states that if the general rules of construction of contracts are applied, the exclusionary clause in question would be interpreted against plaintiff, the insured. *This is a misstatement of the law.* Even if an insurance contract is not a contract of adhesion, any 'ambiguity or uncertainty in the contract is to be resolved against the insurer.' [Citation.]" (*Jones, supra,* at p. 639, fn. 3; italics added.)

The language of *Ponder* v. *Blue Cross of Southern California, supra,* 145 Cal.App.3d 709, is also applicable here. "We hold the contract between

---

[6]The value of the *Madden* opinion has been further undermined by legislative amendment prescribing form and content of arbitration provisions in health care contracts. (See Code Civ. Proc., § 1295.)

Blue Cross and the Ponders was both an adhesion contract for insurance and a standard insurance contract marketed with the general public, *if there is any difference. Whichever of those characterizations applies, any exclusion from coverage must be presented in such a manner that is conspicuous to the reader.* [Italics added.] The exclusion also must be stated in language which is *plain and clear* in the sense it is 'comprehensible to lay persons' . . . ." (*Id.*, at p. 727.)

Finally, Blue Shield tells the subscriber to read the entire policy; such direction is not a substitute for notice to the subscriber of a loss of benefit. In *Government Employees Insurance Co.* v. *United States* (10th Cir. 1968) 400 F.2d 172, 175, the new policy instructed the insured to carefully read the contract as submitted. "This alone is insufficient to call attention to the change in coverage" said the federal appeals court, but "a short, separately attached boldly worded modification, seems clearly appropriate." (*Ibid.*; fn. omitted.) The rule is and should be: Deletions or exclusions from a renewal group policy should be communicated and explained to the subscriber by a plain, clear and conspicuous writing. The prominent and express listing of certain specific changes whether grants or exclusions coupled with the omission of very specific exclusion of coverage, can only mislead the subscriber. Reduction of benefits, to be effective, cannot be placed in an unconspicuous place under the heading "Supplemental Benefits." The foregoing cases and reasons compel this conclusion: The *Madden* rule excusing the strict requirement of notice of reduced coverage does not apply to the Fields policy.

### III

The trial court concluded payment for psychoanalysis when coupled with satisfaction of a training or educational requirement was excluded under the 1975 policy language. One sentence on page 16 in the 1975 policy could be *in extremis* construed to possibly exclude psychoanalysis which also qualified the recipient for certification. There was an exclusion for "Marital, family, or other counseling or training services" found under Supplemental Benefits. This language if strained to the limit to exclude the coverage here in issue is at best ambiguous. In such case it must be construed against the drafter, the insurer. (*Federal Leasing Consultants, Inc.* v. *Mitchell Lipsett Co.* (1978) 85 Cal.App.3d Supp. 44, 48 [150 Cal.Rptr. 82]; *Schmidt* v. *Pacific Mut. Life Ins. Co.* (1969) 268 Cal.App.2d 735, 738 [74 Cal.Rptr. 367].) As a matter of law language in the 1975 plan was not so clear or so precise in meaning as to exclude benefits for psychoanalysis which was also used to complete a training program. Blue Shield, moreover, with full knowledge of Dr. Orr's treatment and its educational component effect, conceded coverage, continued to pay for the psychoanal-

ysis until 1978. Construction placed by the drafting party upon the 1975 contract language refutes its present contention.

## IV

In 1975 Dr. Fields had a covered nervous or mental illness. He began to receive benefits by way of psychoanalytic treatment during the effective period of the 1975 service benefit plan. This was before the "furtherance of education" exclusion was added in the 1976 policy. Under the 1975 contract he was entitled to, upon sustaining a mental and nervous illness, individual or group therapy not exceeding a total of two hours per day and collateral visits with members of the patient's immediate family provided by a therapist who is a physician, clinical psychologist, psychiatric nurse or psychiatric social worker, not to exceed "a lifetime maximum of $50,000."

■ The 1975 booklet notified Dr. Fields the plan could be periodically modified: "The contract may be modified or terminated. However, *no such modification or termination will effect adversely any benefit for a covered service rendered prior to such modification or termination.*" (P. 2; italics added.)

This latter provision is subject to the valid criticism that it is ambiguous on its face. Blue Shield confirms this language was ambiguous by the clarifying changes it made in the 1976 policy. In the 1976 and 1977 plan booklets the following language appears in bold print. "To the extent that benefits for a service or supply are eliminated or modified for a new contract year, benefits will not be provided for those services or supplies rendered after the effective date of the elimination or modification, even though benefits may have been provided for the same service or supply rendered before the effective date of the elimination or modification." (P. 2.)

This language added in 1976 clarifies to a modest degree the clearly ambiguous language in the 1975 policy. It seeks to avoid the interpretation of the contract as to permit the vesting of rights for treatment commenced during the contract period. Whether this latter change clears or muddies the "vested right" waters, we need not address (except as these latter modifications confirm Blue Shields' recognition the 1975 language as ambiguous), for it is the language of the 1975 policy that is critical and controlling.

The 1975 provision is not only ambiguous on its face but also it conflicts with the "lifetime maximum Supplemental Benefits . . . [of] $50,000.00" grant. By conventional contract law the ambiguity must be construed against Blue Shield, the party who created the ambiguity. Where a health insurance

contract is susceptible to different reasonable constructions, it is ambiguous—the insurance policy is to be strictly construed against the insurer. (Civ. Code, § 1654.)

## V

Dr. Fields next contends Blue Shield cannot limit the benefits for psychoanalysis without his consent because the benefits became *vested* (i.e., fixed, not subject to later retraction) under the 1975 plan. He points to specific language in the 1975 plan (and repeated in subsequent plans) which grants benefits for psychiatric services (nervous and mental illness) to include "the lifetime maximum Supplemental Benefits payable for treatment of nervous and mental illness is $50,000 for each subscriber." (P. 14.) This language evidences a clear contractual intent of Blue Shield to provide for nervous or mental illness which might persist for the lifetime of an insured; once treatment was begun for a specific mental illness Blue Shield was obligated to pay for it until a $50,000 lifetime maximum was reached. These benefits, up to $50,000 (as explained in IV *ante*), became vested as a matter of legal and contractual right under language of the 1975 plan.

Blue Shield would interpose this preliminary barrier to the vesting rule. Dr. Fields, it is asserted, waived his right to make this argument before the appellate court because he did not raise it at the trial court level. As a general principle of law a party may not present a new theory of liability for the first time on appeal. Where, however, the argument presented for the first time on appeal involves only a question of law determinable from a factual situation already present in the record, it may be argued to the appeal court. (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 340 [303 P.2d 738].) Here all the relevant facts pertinent to this legal issue were fully presented to the trial court. This case therefore falls within the exception to the general rule a party may not for the first time on appeal offer an additional basis for recovery. (*Marsango* v. *Automobile Club of So. Cal.* (1969) 1 Cal.App.3d 688, 694 [82 Cal.Rptr. 92].)

## VI

Can Blue Shield cancel, withdraw, reduce benefits rights accrued under prior years contract? The general rule relevant to attempts at cancellation of vested, accrued benefits of a group policy is: "A valid cancellation or modification of a group policy . . . does not have the effect of releasing the insurer from liability which accrued prior thereto by reason of the happening of the contingency insured against. *In other words, once liability has attached under a group policy—that is, after the happening of the event insured against—cancellation or modification of the master policy*

*is ineffective to preclude recovery by the employee or his beneficiary as provided by the original policy, irrespective of whether the policy is contributory or noncontributory.* " (Annot., 68 A.L.R.2d 249, § 17, pp. 278-279; italics added.)

Learned treatises on the law of insurance also give unqualified support to the rule the right to receive benefits fully vests at the time of disability and cannot be divested by subsequent termination of the policy. Appleman's well-respected Insurance Law and Practice states: "The rights of the insured, where disability occurs prior to the lapse of the policy, are considered vested or fixed, so that recovery can be had." (1C Appleman, Insurance Law and Practice, § 644, p. 222.) According to Couch on Insurance: "Since rights vest upon loss, a cancellation of the policy cannot destroy liability which has already attached for prior disability or death. A certificate issued under a master group policy providing for disability payments or death payments is not avoided by a cancellation of the policy by the employer where a compensable disability has occurred prior to such cancellation . . . ." (19 Couch on Insurance (2d ed.) § 82:121, p. 864.) Moreover, it was stated in 44 American Jurisprudence Second, Insurance, section 1857, page 852: "More specifically, the general rule as to the effect of such clauses is that where a loss insured against occurs before the insured's employment is terminated within the meaning of the 'termination of employment' clause, the insurer is liable under the policy, but where such loss occurs after the insured's employment has been terminated, the insurer is relieved of liability provided none of the special policy provisions extending coverage under certain circumstances is applicable." (Fns. omitted.) This rule is widely accepted. Cases cited in 68 American Law Reports, Second, *supra,* sections 17 through 18, pages 279 through 282, support these learned conclusions.[7]

In point is *Danzig* v. *Dikman* (1980) 78 App.Div.2d 303 [434 N.Y.S.2d 217] (affd. 53 N.Y.2d 926 [440 N.Y.S.2d 925, 423 N.E.2d 402]), a case closely akin factually to Dr. Fields'. In *Danzig,* Blue Cross/Blue Shield provided in its booklet: "[A]fter the deductible ($100) is met, during each Benefit Period, 'Major Medical Benefits then apply' and Major Medical Benefits will then pay '80% of Covered Expenses *up to a maximum allowance of $50,000*' with '(t)he lifetime maximum' being 'unlimited.' " (434 N.Y.S.2d, at p. 218; italics added.) Some years later Blue Cross amended the contract to provide that the lifetime maximum of $5,000 was available for private duty nursing care in place of the prior unlimited lifetime maxi-

---

[7]Blue Shield cites *Bartulis* v. *Metropolitan Life Insurance Company* (1966) 72 Ill.App.2d 267 [218 N.E.2d 225] and others in support of its no-vesting contention. The cases are not factually in point. The policy *had been terminated before* the insured incurred the medical expenses, before the vesting occurred.

mum. Danzig, while a subscriber, suffered a massive stroke and required daily nursing care.

The New York appellate court held the modification of the group health policy reducing the lifetime maximum for expenses for private duty nursing care from an unlimited amount to $5,000 was ineffective as against a policy subscriber suffering a disabling illness and receiving private duty nursing care benefits under the policy before the modification of the policy and who had not consented to the modification. The New York court reasoned: "Parenthetically, the existence of a lifetime maximum (whether limited or unlimited) discloses an awareness on the part of the insurer and all interested parties that an illness or condition might well continue indefinitely beyond any one contract term and, indeed, persist for the lifetime of an individual subscriber or his or her beneficiary." (*Danzig* v. *Dikman, supra,* 434 N.Y.S.2d 217, 220-221.)

The New York court also applied the same general rules of construction applied here in I through V (*supra*) to impose liability upon Blue Cross/ Blue Shield.

In *Myers* v. *Kitsap Physicians Service* (1970) 78 Wn.2d 286 [474 P.2d 109, 113, 66 A.L.R.3d 1196], a fairly analogous situation to the instant matter was presented. Myers, after obtaining coverage under a health care service contract, suffered a chronic kidney disorder necessitating hospital hemodialysis treatments. In order to avoid an arbitration determination and a court determination which concluded the hemodialysis treatments were covered under the health care contract, defendant health care service contractor modified the health care contract during December 1966, effective February 1, 1967, to exclude chronic kidney disorder treatments from coverage. Requisite premium payments were continually made. The Supreme Court stated, in pertinent part: "[O]ur law is clear in holding that ambiguities in an insurance contract must be interpreted in the light most favorable to the insured [citation], and that the language of an insurance contract should in fact 'be interpreted in accordance with the way it would be understood by the average man purchasing insurance.' [Citations.]

". . . . . . . . . . . . . . . . . . . . . .

"We therefore conclude that the contract before us, when considered for the purpose of granting or rejecting plaintiff's claim for hemodialysis hospitalization benefits after February 1, 1967, may reasonably be given more than one interpretation. Although the contract is a health service contract, one reasonable interpretation of its provisions would be grounded on the same legal principle applied generally in cases relating to health and acci-

dent insurance policies, i. e., *that plaintiff's rights under the contract became vested when medical treatment became necessary. Those rights being vested, the subsequent termination of the policy which created the right did not terminate the vested right of the plaintiff to payment of services rendered and to be rendered.*" (474 P.2d 109, 110-111; italics added.)

The single California case found in point on the vesting issue is *Wright v. Prudential Ins. Co., etc.* (1938) 27 Cal.App.2d 195 [80 P.2d 752]. An insured employee became disabled while the original contributory master group policy providing coverage was in force. The employee was held not precluded from recovering disability benefits under the contract because thereafter on an anniversary date another group policy not containing such a disability benefit was substituted. In support of its conclusions this court pointed out the employee had not been notified of the change and no change was made in the deduction of premiums payable for the policy. Finally, the court said concerning the receipt of a new policy: "*His receipt of the new certificate could not by any possibility in any way have misled appellant insurer to its detriment, nor have estopped him to assert any right vested in him under policy G-1904 [the earlier policy].*" (27 Cal.App.2d at p. 218; italics added.)

Dr. Fields' interpretation of the lifetime $50,000 maximum language is supported by Blue Shield's own acts in interpretation of its own contract. It permitted Dr. Fields to obtain benefits for the years 1976 and 1977 without complaint. We conclude Dr. Fields had a vested right in $50,000 lifetime maximum benefits under his 1975 policy.[8] For this further reason the judgment must be reversed with direction to enter judgment on behalf of Dr. Fields as to the compensatory damage aspect of his complaint.

---

[8]Blue Shield points to the fact in 1976 Dr. Fields became the employee-insured on the contract and Mrs. Fields, the dependent. (She retired because of pregnancy.) Blue Shield contends there was a "new contract," not a modification of the 1975 contract and concludes no notice of reduction of benefits was required as to this "new" policy. The cited vested right authorities and cases dispose of this precise contention. (See also *Fagan* v. *John Hancock Mutual Life Insurance Company* (D.C. D.Ka. 1961) 200 F.Supp. 142, 144; *Hayes* v. *Equitable Life Assur. Soc.* (1941) 235 Mo.App. 126 [150 S.W.2d 1113]; *Lindgren* v. *Metropolitan Life Insurance Company* (1965) 57 Ill.App.3d 315 [206 N.E.2d 734]; *Myers* v. *Kitsap Physicians Service, supra,* 474 P.2d 109, 113; *Danzig* v. *Dikman, supra,* 434 N.Y.S.2d 217, 220; *Sparks* v. *Republic Nat. Life Ins. Co.* (1982) 132 Ariz. 569 [647 P.2d 1127, 1132, 1135]; *Fassio* v. *Montana Physicians' Service* (1976) 170 Mont. 320 [553 P.2d 998, 1001]; *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 465 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Wright* v. *Prudential Ins. Co., etc., supra,* 27 Cal.App.2d 195, 218; *Founders Life Assur. Co. of Fla.* v. *Poe* (1978) 242 Ga. 748 [251 S.E.2d 247, 249]; *Mattis* v. *State Farm Fire & Cas.* (1983) 118 Ill.App.3d 612 [73 Ill.Dec. 907, 454 N.E.2d 1156, 1159]; *Dawes Min. Co., Inc.* v. *Callahan* (1980) 246 Ga. 531 [272 S.E.2d 267, 271-272]; *Greer* v. *Continental Cas. Co.* (La.App. 1977) 347 So.2d 70, 72; *Nick* v. *Travelers Ins. Co.* (1945) 354 Mo. 376 [189 S.W.2d 532, 537-538]; *Central Tablet Mfg. Co.* v. *United States* (1974) 417 U.S. 673, 685 [41 L.Ed.2d 398, 407, 94 S.Ct. 2516]; 9 Couch on Insurance (2d ed. 1962) § 40.52.)

## VII

 Blue Shield urges Dr. Fields' rights to benefits be rejected on the basis of the doctrine of "Federal Preemption." At trial, Blue Shield counsel was unable to cite any federal law which would preclude recovery by Dr. Fields on the state action. On appeal, Blue Shield cites 5 United States Code section 8902(m)(1) which provides: "The provisions of any contract under this chapter which relate to the nature or extent of coverage or benefits (including payments with respect to benefits) shall supercede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans *to the extent that such law or regulation is inconsistent with such contractual provisions.*" (Italics added.)

For the "Federal Preemption" doctrine to apply here, Dr. Fields' claim would have to be "inconsistent with [the Blue Shield policy] contractual provisions." No "coverage or benefit sought in his lawsuit is inconsistent with the Blue Shield policy grant in 1975 of rights in Dr. Fields that vested. Dr. Fields seeks enforcement of Blue Shield's obligation based upon the express terms of its policy.

Moreover, this case does not involve factually or legally the "virtually unique preemption provision" as found in section 514(a) of ERISA.[9] (29 U.S.C. § 1144(a).) ERISA is a comprehensive regulatory scheme intended to protect the interests of employees in fringe benefit plans offered by the employers. (See *Shaw* v. *Delta Air Lines, Inc.* (1983) 463 U.S. 85, 90 [77 L.Ed.2d 490, 497, 103 S.Ct. 2890]; *Provience* v. *Valley Clerks Trust Fund* (1984) *ante*, pp. 249, 253, fn. 1 [207 Cal.Rptr. 276].) The limited preemption doctrine expressed in section 8902(m)(1) does not preclude recovery by Dr. Fields. The ERISA preemption language has no application to the Blue Shield contract of insurance.

## VIII

Finally, Dr. Fields' appeal seeks a new trial on his complaint for breach of the implied covenant of fair dealing. This matter was fully tried to the jury and the jury verdict returned against Dr. Fields. In light of the factual nature of this issue and the disputed evidence before this court, we are compelled to follow the traditional appellate rules of review. Where a matter has been determined as a matter of fact by a jury and substantial evidence supports that finding, we must and do conclude no lawful basis exists for reversal and granting of a new trial as to this claim.

---

[9]Section 514(a) of ERISA (29 U.S.C. § 1144(a)) preempts "*any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.*" (Italics added.)

The judgment is reversed as to the directed verdict denying compensatory damages and the cause is remanded with direction to the trial court to enter judgment for Dr. Fields for the 1978 medical/psychiatric expenses incurred. The judgment is in all other respects affirmed. Each side shall bear its own costs.

WIENER, J.—██ ██ I agree with Justice Staniforth that Fields' benefits became vested under the 1975 plan and for that reason concur in the judgment. (See lead opn. *ante,* pp. 585-588.)

Little is gained by my adding further to the thoughtful dialogue between the other members of this panel. I nonetheless think it may be helpful to briefly note the following.

I believe it is important to understand how this case was tried. Interestingly, and I believe of particular significance to certain blanket assertions made in the dissenting opinion, (see dissent *post,* introductory par., p. 611 and the first par. of sec. III, p. 614), Blue Shield did not argue that Fields' treatment was medically unnecessary. For tactical reasons undoubtedly made in light of strong evidence that there was a medical reason as well as an educational one for Fields to seek psychoanalytic services, defense counsel focused on the exclusions of the respective policies starting with the 1976 policy. Highlighting those paragraphs Blue Shield convinced the jury that even if medically necessary there was no coverage. Regardless of medical necessity the jury decided Blue Shield was not obligated to pay for Fields' treatment because he also received it in furtherance of his education.

It is also worth noting that in reference to the 1975 plan the dissent goes further than requested by Blue Shield in characterizing the exclusion as "clear on its face." Even Blue Shield concedes that its effort to exclude "training services" is ambiguous since that provision fails to address whether it applies when the treatment is also medically necessary. Thus, there is no factual support for the dissent's statement that "Fields did not enter upon psychoanalysis to treat a nervous or mental illness." Had the jury so decided I would obviously have reached a different conclusion.

I also respectfully disagree with the dissent's implied conceptual premise in disapproving the lead opinion's treatment of the vesting issue as one of law and not of fact. The dissent seems to assume that without further consideration a health plan subscriber gives up his or her rights to a medically necessary benefit being received for an existing and continuing condition solely because a new policy with additional exclusions may have been issued. In my view, medical and hospital benefits in an issued plan can be meaningful only if the concept of vesting is recognized. Although objective

analysis is not served when a decision rests on a parade of horribles I must nonetheless admit that to ignore vesting is to ignore the most traumatic human suffering. On the effective date of newly issued policies with additional exclusions unsuspecting subscribers could have their dialysis machines unplugged or blood transfusions stopped solely because of their inability to pay for those desperately needed services. I cannot quarrel with newly issued health coverage policies containing revised benefits because theoretical financial projections may have turned out to be inaccurate. It is something else, however, to renege on a legally binding bargain because that bargain was not as profitable as anticipated. I am satisfied that lacking unusual circumstances where the vested subscriber wants to negotiate a waiver of his or her rights, and the parties for additional consideration agree what should be paid either in cash or benefits for that waiver, vesting remains a legal issue and not a factual one.

Undoubtedly vesting presents administrative difficulties. I query whether the dissent's parade of horribles is an adequate response particularly where the "horrible" here was clearly of Blue Shield's own making. Blue Shield must assume the financial burden and pay covered benefits for those subscribers who have dutifully paid their premiums. If there are additional costs not already computed into Blue Shield's fee structure presumably those expenses will be determined and passed on in new policies to those subscribers whose coverage has not vested. Not only is such a solution consistent with Blue Shield's contractual commitments and one required by law, but it is also consistent with the reasonable expectations of Blue Shield subscribers who rightfully assume their contracts will be administered by Blue Shield in a fair and compassionate manner.

**BUTLER, J.**—I dissent for three reasons. First, Blue Cross has no obligation to subsidize the psychoanalytic education of Edward L. Fields. Blue Cross provides benefits for *covered illness, not tuition for student doctors.* Second, at the appellate level we should not resolve issues, here the vesting of benefits, not addressed at the trial by the parties or the court. As I shall explain, so to do on this record is to resolve social, economic and administrative policies without the benefit of reasoned findings based on competent evidence. Third, the concept of vesting announced by the majority is the enactment by a state court of legislation impacting federal sovereignty from which we are barred by accepted constitutional principles.

I

Consistent with familiar rules on appeal, I state the facts to support the jury verdict.

Fields graduated from medical college in 1968 and spent the following year through June 1969 in an internship program. After three years as a medical officer, he was discharged from the Navy in June 1971. He then began a residential program in psychiatry at the University of Pittsburgh completing that program in June 1974.

In 1973, before completing his residency training, Fields made a career choice to become a psychotherapist. This requires attendance for four years at an accredited psychoanalytic institute. The American Psychiatric Association granted the San Diego Psychoanalytic Institute (Institute) provisional institute status in December 1974 with full accreditation in December 1977. The Institute has two functions: training qualified students in psychoanalysis and fostering the application of psychoanalytic knowledge in the community. Among other things, the education program included a requirement for personal psychoanalysis: "The foundation of psychoanalytic training is the clinical associate's personal psychoanalysis, which must be with an authorized training analyst. For the training program, a minimum of 300 hours of personal analysis is required. Beyond this, the duration of analysis is left to the decision of the training analyst and the clinical associate, depending solely upon the therapeutic needs of the clinical associate. In accordance with the Minimal Standards of the American Psychoanalytic Association, the personal analyses of clinical associates shall be conducted four or more times a week, except when special technical considerations provide an indication for temporary interruption or alterations of frequency.

"Clinical associates are required to initiate analysis with a training analyst within eighteen months of the date of their acceptance at the Institute. . . .

"The accepted applicant selects his training analyst from the roster of training analysts in accordance with their availability." On May 21, 1973, Fields submitted an application for enrollment in the training program at the San Diego Psychoanalytic Institute. He knew the requirements for training as a psychoanalyst included this personal psychoanalysis. Fields came to San Diego in 1973 while still in the residency program at Pittsburgh and interviewed four psychoanalysts, including Dr. Orr, all of whom were on the roster of training analysts at the Institute. He did not interview any analysts who were not on that roster. On September 18, 1973, Fields' application for enrollment was accepted by the Institute. After he finished his residency in Pittsburgh, Fields moved to San Diego in June of 1974 and entered private practice in general psychiatry.

Before moving to San Diego in 1974, Fields decided to engage Dr. Orr as a training analyst as required by the rules of the Institute. The analysis sessions, however, were delayed until October of 1974 as Orr did not have

an opening until that month. Consistent with the Institute requirements, Fields met weekly with Orr for five psychoanalytic sessions of one hour each commencing in October of 1974, although he didn't start his work at the Institute until September of 1975. He received full credit for the training analysis on the Institute's records of academic achievement from the date his analysis began in October of 1974. In June 1980, after five and a half years and a total of 1,208 hours of treatment, Fields completed his psychoanalysis with Dr. Orr. The termination of the analysis was planned well in advance as Fields decided in August or September of 1979 to conclude the analysis in June of 1980 to coincide with the completion of his course work at the Institute from which he finally graduated in November 1980.

## II

Prior to the move to San Diego, Fields' wife was employed by the federal government. She was covered under a health plan provided by the Aetna Life Insurance Company. Fields was enrolled as her dependent. The Aetna plan provided for reduced psychoanalytic benefits effective January 1, 1975. Fields knew this. The Federal Employees Health Benefits Act included an "open season" during which employees could switch to other health coverage. Fields looked around and found Blue Cross group insurance available for government employees covered psychiatric treatment for mental and nervous illness. Effective January 1, 1975, Mrs. Fields switched to the government-wide service benefit plan administered by Blue Cross and Blue Shield. Again, Fields was her dependent under the Blue Cross plan.

The 1975 plan is organized in various sections and explains benefits under each such section. These are referred to as basic hospital benefits, basic surgical-medical benefits, maternity benefits, supplemental benefits and special 100 percent supplemental benefits-both options. Under supplemental benefits, the plan explains lifetime maximum supplemental benefits payable for each subscriber as including high option and low option. Immediately under that appears the following: *"Exceptions for nervous and mental illness*—Under both options, the lifetime maximum Supplemental Benefits payable for treatment of nervous and mental illness is $50,000 for each subscriber. Expenses applied to this $50,000 maximum benefit also apply to the $250,000 high option or $150,000 low option lifetime maximum benefit."* The description of supplemental benefits then describes covered services and benefits for nervous and mental illness. The majority opinion neglects to reproduce the clear, concise and unambiguous exclusion of training services from policy coverage: "Nervous and mental illness—In addition to other services and supplies covered by Basic or Supplemental Benefits, the following services are covered under Supplemental Benefits:

"Day-night hospital services

"Individual or group therapy not exceeding a total of 2 hours per day, and collateral visits with members of the patient's immediate family, provided by a therapist who is a physician, clinical psychologist, psychiatric nurse, or psychiatric social worker.

"Services of a psychiatric nurse or psychiatric social worker must be performed at the direction and under the supervision of the attending physician (M.D.). The records of the attending physician must show that the physician either saw the patient, or had written or personal consultation with the therapist, at least once every 90 days; in any case, the attending physician must see the patient for evaluation at least once every 12 months.

"*The following are not covered*—

"Marital, family, or other counseling or *training services*

"Hypnosis or hypnotherapy

"Services rendered or billed for by a school or halfway house or a member of its staff." (Italics added.) Under the heading "Special 100% Supplemental Benefit—Both Options" the plan points out that when the total of supplemental benefits amounts to $4,000 for expenses incurred in a calendar year, supplemental benefits for covered expenses will be paid at 100 percent. The paragraph then provides: "However, benefits payable for treatment of nervous and mental illness are excluded from this Special Supplemental Benefit."

### III

I do not have any difficulty reading the coverage provided under supplemental benefits in the 1975 plan with respect to nervous and mental illness. I find the exception to coverage as it reads, "The following are not covered—Marital, family or other counseling or training services . . ." clear *on its face. Training services are not covered as supplemental benefits.* The jury likewise so concluded in returning a verdict for Blue Cross. That factual determination by the jury derives from substantial evidence Fields elected to undertake psychoanalysis to meet the requirement imposed by the Institute as a condition to satisfactory completion of its psychoanalytic course. Fields did not enter upon psychoanalysis to treat a nervous or mental illness. He did so as an adjunct to his training as a psychoanalyst.

I do not find necessary in this case the application of familiar rules in the construction of exclusionary provisions of medical insurance policies followed in *Ponder* v. *Blue Cross of Southern California* (1983) 145

Cal.App.3d 709, 723 [193 Cal.Rptr. 632]. Fields made an informed choice in switching from Aetna coverage to Blue Cross. His education was the only reason to seek psychoanalytic treatment from Dr. Orr. The training exclusion is conspicuous, plain and clear as set out in the plan coverage section outlining benefits for nervous and mental illness. (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 271 [419 P.2d 168].) But we need not cross that threshold as the plan is not an adhesion contract as found in *Gray*. The factors characterizing a plan as an adhesion contract as spelled out in *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710-711 [131 Cal.Rptr. 882, 552 P.2d 1178], are not present here. First, the provision at issue is not weighted as to either party in the circumstances presented. *Fields did not have a nervous or mental illness. He was a student required to undergo psychoanalysis as part of his training.* Second, the plan was negotiated between the federal government and Blue Cross. In *Madden,* the court found the state Employees Retirement System negotiated the contract with Kaiser Foundation Health Plan on behalf of state employees and had a consequent parity of bargaining strength. Here, the federal government negotiated the contract, I assume in its own behalf. Premiums for coverage of employees are paid by the federal employer. Those premiums are priced out on the basis of anticipated payments by the carrier. It follows the benefits and the exclusions are negotiated at arm's length. The person hired as a federal employee who accepts Blue Cross coverage is thus arguably in an adhesionary posture as to the federal employer who offers the plan. But this posture does not create an adhesionary relationship between the employee and Blue Cross which bargained the terms of the plan with the employer. The plan is the product of the employer and Blue Cross who are on a parity. Third, Fields had the opportunity to continue with Aetna or switch to Blue Cross. In *Madden,* the court found like opportunity to select between plans. Lastly, Fields' lawyer stipulated at trial the plan did not constitute a contract of adhesion.

## IV

In January 1975, Mrs. Fields was the federal employee enrolled in the plan and Fields was a covered family member. A series of supplemental benefit summaries show psychoanalytic analysis for Fields from January 6, 1975 through March 25, 1976, and from June through August of 1976. Mrs. Fields is the federal employee and subscriber and Fields is the patient. The claim identification number is R17930187. Dr. Orr's charges during this period totaled $12,224 credited toward the $250,000 maximum benefit for all care and $11,968 credited toward the $50,000 maximum for nervous and mental illness. Mrs. Fields quit her federal job in August 1976 and Fields went to work for the Veterans Administration Hospital, enrolling in August 1976 as the subscriber in the 1976 Blue Shield plan. That plan, effective

January 1, 1976, expanded on services not covered in the treatment of nervous and mental illness, and as expanded, read as follows: "Services not covered—

"Marital, family, or other counseling or training services.

". . . . . . . . . . . . . . . . . . . . . . . .

"Psychoanalysis or psychotherapy, provided to a Subscriber or any family member, that is credited towards earning a degree or furtherance of the education or training of a Subscriber, regardless of diagnosis or symptoms that may be present." The supplemental benefits summary form for the period October 25 through November 24, 1976, is addressed to Fields as the subscriber and covered employee and who is shown as the patient under a new identification number R21166640. That form shows Dr. Orr's charges for $880, a deductible of $100 (satisfied for the year) and a coinsurance deductible of $156. The $624 is charged against the $50,000 maximum for nervous and mental illness benefits.

Significantly, the last form in 1976 with Mrs. Fields as the subscriber, August 1976, shows a total of $11,968 credited toward the $50,000 nervous and mental illness benefit maximum. Yet in that same year, the November 26, 1976, form with Fields as the subscriber shows only $624 credit toward the $50,000 maximum. The conclusion is inescapable. Following termination in midyear of Mrs. Fields' federal employment, Fields enrolled in the 1976 plan as a covered employee. Benefits thereafter were paid to him as a subscriber and covered employee under identification number R21166640. No benefits were paid to him as a dependent after August 25, 1976 under Mrs. Fields' policy R17930187.

This extended documentary exposition demonstrates conclusively Fields enrolled as the covered employee and subscriber under the 1976 plan and the parties following August 25, 1976, looked solely to the 1976 plan as the instrument governing their rights and remedies. Fields' August 1976 enrollment in the 1976 plan required the submission of enrollment documents and his receipt and review of the 1976-1977 plan booklet, a controverted issue at trial and supported by the jury verdict. In bold print appears the following: "To the extent that benefits for a service or supply are eliminated or modified for a new contract year, benefits will not be provided for those services or supplies rendered after the effective date of the elimination or modification even though benefits may have been provided for the same service or supply rendered before the effective date of the elimination or modification." And as earlier noted, the 1976 plan in which Fields enrolled as a covered employee specifically excluded from coverage psychoanalysis

provided a subscriber that is credited toward furtherance of education or training of a subscriber.

If the 1975 plan is deemed not to exclude payment for Fields' psychoanalytic education on the basis the exclusion in the policy of "training services" is ambiguous, the 1976 plan applicable to Fields from August 1975 clearly bars tuition payments.

V

The majority finds benefits payable for Fields' education became vested under the 1975 plan and not subject to later retraction under subsequent amendments or modifications to that plan. Fields did not raise this vesting issue in the trial court. This novel theory of liability is raised for the first time on appeal. The majority elects to address the issue as involving only a question of law determinable from a factual situation already present in the record citing *Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 340 [303 P.2d 738]. In *Panopulos*, the facts were undisputed. The guest statute barred recovery from the driver of a vehicle. At trial, the plaintiffs, injured in an accident when an exiting elderly passenger hit the gear shift and the accelerator, tried their case solely on the theory they were paying passengers and not guests. On appeal, they argued for the first time the statute was not applicable as the defendant was not the driver. It was undisputed the host driver in fact had exited the vehicle when it lurched forward and the issue was solely one of law. "If a question of law only is presented on the facts appearing in the record the change in theory may be permitted. [Citation.] But if the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial the opposing party should not be required to defend against it on appeal. [Citations.]" (*Panopulos, supra,* at p. 341.)

*Marsango* v. *Automobile Club of So. Cal.* (1969) 1 Cal.App.3d 688 [82 Cal.Rptr. 92], also cited by the majority, applies the general rule a party to an action may not for the first time on appeal change his theory of the cause. The court found the change in theory involved not a pure question of law but factual issues open to controversy. "Litigation is an adversary process contemplating an element of risk to all parties. To permit a change of theory on appeal is to allow one party to deal himself a hole card to be disclosed only if he loses. Even if that device does no more than give him a second chance, it has unbalanced the inherent risk of the litigation and put the other party at a disadvantage. Such a process is to be allowed if at all only under unusual circumstances—as for example where the question is purely one of law so that it cannot be said that the balance of litigation risk was altered

by the failure to raise it at trial. The record before us discloses no such circumstances." (*Id.*, at p. 695.)

*Panopulos* involved no factual dispute. The host driver had exited the car. *Marsango* declined to hear a new theory on appeal. From the recitation of facts and law set out here and in the majority opinion, it is clear the issue of vesting requires resolution of factual issues and is not a pure question of law.

### A.

Vesting under the 1975 plan requires the conclusion the 1976 plan in which Fields enrolled and under which benefits were paid from August 1976 is entirely to be ignored. The facts are to the contrary. The records show a new plan identification number and a new startup in the computation of payments attributable to the lifetime $50,000 benefit. The parties acquiesced in a "roll-back of the odometer." Mrs. Fields' termination of employment resulted in a termination of her coverage as a subscriber and covered employee. (5 U.S.C. § 8901 and 5 C.F.R.[1] §§ 890.102(a) and 890.304(a).) Fields was by reason of his new federal employment eligible to and did enroll in the government-wide service benefit plan.

### B.

The legal issue depends on resolution of facts. It follows no pure question of law is presented. Indeed, the extensive analysis in the majority opinion suggests the legal issue is less than pure.

### VI

The importance to the insurers of health care of the concept of vesting announced by the majority cannot be overstated. As Fields concedes in his briefs and in arguments before us, the industry awaits resolution of this issue with bated breath. To do so on this record is simply unfair. Blue Cross had no opportunity to develop before the trial court the consequences of vesting of rights to benefits under the 1975 plan. We interpret statutes to avoid absurd results; we should do the same in construing the exclusions for psychoanalytic education in these plans.

Trial below proceeded solely on the tort theory of breach of the covenant of good faith and fair dealing, not on breach of contract. The majority holds damages recoverable on that theory on this record which demonstrates Blue

---

[1] All section references are to 5 Code of Federal Regulations unless otherwise specified.

Cross was never put on notice of a vesting of benefits breached by its failure to recognize the emergence of a new concept of liability.

The vesting rule is inconsistent with the provisions of the Federal Employees Health Benefits Program regulations (§ 890.101 et seq.). The inconsistency is demonstrated by an examination of the provisions of section 890.401.

Paragraph (a) of section 890.401 provides, upon termination of enrollment, for a 31-day extension of *coverage* during which the right of conversion to an individual plan may be exercised. Subparagraph (b)(1) of that regulation provides as follows: "Any person who has been granted a 31-day extension of coverage in accordance with paragraph (a) of this section and who is confined in a hospital or other institution for care or treatment on the 31st day of the temporary extension is entitled to continuation of the *benefits* of the plan during the continuance of the confinement but not beyond the 60th day after the end of the temporary extension." (§ 890.401(b)(1), italics added.) If a right to benefits for ongoing treatment was "vested," there would be no need for such an extension of benefits and this regulation would be surplusage.

It is important to note the differences in language between section 890.401(a) and section 890.401(b)(1). The 31-day extension under paragraph (a) is an extension of *coverage*. The additional 60-day extension under subparagraph (b)(1) is an extension of *benefits* only. Furthermore, subparagraph (b)(1) specifically indicates that the extended entitlement to benefits does not continue beyond the 60th day after the end of the temporary extension of coverage under paragraph (a). This unequivocally indicates that a right to benefits for an ongoing course of treatment does not "vest" under the health plans made available to government employees under the Federal Employees Health Benefits Act.

The provisions of section 890.401(b)(2) are also relevant here. Mrs. Fields' enrollment was terminated in 1976. Dr. Fields' enrollment began at about that same time. It is not clear whether that sequence of events should be considered a change of Dr. Fields' enrollment from one plan to another, or from one option of a plan to another option of that plan as those terms are used in section 890.401(b)(2). If anything, Dr. Fields' enrollment upon termination of his wife's enrollment seems to represent an even more significant change. However, if the provisions of section 890.401(b)(2) were applicable, it is clear that the maximum period during which Dr. Fields would have continued to have been entitled to benefits under Mrs. Fields' enrollment is 91 days, and then only if he were continuously confined in a

hospital or other institution during that time. This also is clearly inconsistent with the notion of a "vested right" to benefits for future treatments.

## VII

Following our request during oral argument, the parties submitted observations on the effects of the vesting rule. I note some of the consequences put forth by Blue Cross. These emphasize we should not adjudicate this issue not raised in the lower court and they categorize the vesting claim as an intrusion into the federal rule-making process.

### A.

The "right" that vests is difficult of definition. Does it embrace the right to all services available in the future or is it limited to those available and received while plan coverage was in effect? Do future deductible amounts apply? What effect do copayment changes have?

### B.

Health plan coverages change from time to time due to a variety of factors. These include changing needs, increasing costs, employer resistance or financial ability to absorb higher premiums. If a right to benefits vests, the plan provisions would freeze as to the vested person. Under a group plan, covered individuals would have rights different from others. In short, an administrative nightmare would result in keeping track of the variables.

### C.

A vesting rule would require exclusions for preexisting conditions to be sure vested rights would not be duplicated as groups change from carrier to carrier and to eliminate for all time any coverage for a preexisting condition. Otherwise, the carrier would be required to pay whether or not a person continues to be covered by the plan or pays a premium for the coverage. This necessarily would require substantial administrative costs to be sure the preexisting condition is not covered and would modify present "waiting periods" before a preexisting condition is covered.

### D.

The determination of the obligated carrier presents significant administrative problems. A covered person under plan A is medicated for a heart condition. Under plan B, he has a heart attack. He moves through plan C and into plan D. He has another heart attack. Which plan determines the

coverage? If plans A, B and C are indemnity plans and D is a Kaiser-type, may D reject treatment on the basis of nonentitlement?

### E.

We deal here with a federal plan negotiated by a federal agency against a broad background of legislation and economic compromises concerning "conversion coverage" where group insurance is terminated without replacement group coverage and rights to reasonable extension of benefits under terminated plans. To insert into that morass a vesting concept without the opportunity for affected federal agencies and other groups to intervene to develop before the trial court these and other problems attendant upon the new rule is an intrusion to attain a result not supported by the evidence and barred by familiar federal preemption concepts.

A petition for a rehearing was denied January 29, 1985.